[No. 64839-0-I. Division One. January 30, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. NAVEED AFZAL HAQ, *Appellant*.

*Rita J. Griffith*; and *Mark A. Larranaga* (of *Walsh & Larranaga*), for appellant.

*Daniel T. Satterberg*, *Prosecuting Attorney*, and *Donna L. Wise*, *Deputy*, for respondent.

¶1 Cox, J. — Naveed Haq appeals his judgment and exceptional sentences for conviction of one count of first

degree aggravated murder, three counts of first degree attempted murder, two counts of second degree attempted murder, and one count each of unlawful imprisonment and malicious harassment. Though Haq alleges numerous errors in his trial below, we hold there were none and affirm.

¶2 RCW 9A.12.010 and 10.77.030(2) specify that an insanity defense must be proved by a preponderance of the evidence. This latter statute places that burden of proof on the defense. Haq fails in his burden to prove beyond a reasonable doubt that these statutes are unconstitutional. Additionally, the State did not violate any constitutional or statutory right of Haq by recording his jail telephone calls and offering those recordings for admission into evidence at trial. Nor did the trial court abuse its discretion in either its evidentiary or discovery rulings. The trial court also properly instructed the jury regarding the aggravated murder charge. The evidence was sufficient to convict Haq of the charge of malicious harassment. Further, because we hold that there was no error below, there was no cumulative error.

¶3 Naveed Haq entered the offices of the Jewish Federation of Greater Seattle late in the afternoon of July 27, 2006. He was armed with two pistols. Once inside, he demanded to speak with a manager. When advised that Haq was armed, the manager alerted another to call 911 before she came out to meet him in the reception area.

¶4 Shortly thereafter, Haq began shooting. He killed one woman and seriously injured five other women.

¶5 Later, Haq spoke with a 911 operator who responded to an emergency call from the Jewish Federaltion's offices. He demanded to be put in contact with the media to "make a point" about America's foreign policy in Iraq and Israel. After several minutes of conversation, Haq specifically demanded to be connected to CNN, and he was told this demand was impossible. He then surrendered to the police response team outside the building.

¶6 The State charged him with aggravated first degree murder, two counts of attempted second degree murder, three counts of attempted first degree murder, unlawful imprisonment, and malicious harassment. Haq raised defenses of insanity and diminished capacity.

¶7 Before the incident at the Jewish Federation, doctors diagnosed and treated Haq for bipolar disorder with psychotic features. Prior to trial, pursuant to Superior Court Criminal Rule (CrR) 4.7 and RCW 10.77.060(2), the court ordered Haq to submit to a mental health examination by the State's mental health expert. This expert testified at trial.

¶8 While awaiting trial, Haq was kept in solitary confinement in the King County jail. He was allowed one hour each day to use the telephone. The jail recorded conversations between Haq and his parents, who live in Eastern Washington. In accordance with jail policies, written notice of the recording of telephone calls was provided to Haq and posted next to each telephone. Additionally, before every phone call, Haq's parents received audio notice that the conversation would be recorded.

¶9 Haq's first trial in 2008 ended in a mistrial due to the jury's inability to reach a verdict. On retrial in 2009, the trial court, over defense objection, admitted into evidence recordings of some of the jail telephone conversations between Haq and his parents.

¶10 The jury convicted Haq of all counts as charged. The court sentenced Haq to life in prison for the first degree aggravated murder conviction and imposed further incarceration time for the other convictions.

¶11 Haq appeals.

## CONSTITUTIONAL CLAIMS

*Burden of Proof for Insanity Defense*

¶12 Haq claims that RCW 9A.12.010 and RCW 10.77-.030 are unconstitutional. Specifically, he claims that the

jury trial rights of article I, sections 21 and 22, carry with them the right to require the State to prove beyond a reasonable doubt that an accused is sane.

■ ¶13 We start with the well-established principle that a statute is presumed constitutional, and the party challenging it has the burden to prove beyond a reasonable doubt that it is unconstitutional.[1] Haq fails in his burden to prove beyond a reasonable doubt that either of these statutes is unconstitutional.

■ ¶14 RCW 10.77.030(2) states that "[i]nsanity is a defense which the defendant must establish by a preponderance of the evidence." Correspondingly, RCW 9A.12.010 states:

> To establish the defense of insanity, it must be shown that:
>
> (1) At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:
>
> (a) He or she was unable to perceive the nature and quality of the act with which he or she is charged; or
>
> (b) He or she was unable to tell right from wrong with reference to the particular act charged.
>
> *(2) The defense of insanity must be established by a preponderance of the evidence.*[2]

¶15 These statutes clearly provide that insanity is an affirmative defense that must be proved by a preponderance of the evidence. RCW 10.77.030(2) places the burden of proving this affirmative defense on the defendant. Thus, the question before us is whether Haq has proved beyond a reasonable doubt that these presumptively constitutional statutes are unconstitutional.

¶16 Haq bases his argument on article I, sections 21 and 22. Both concern the right to a jury trial under the Washington Constitution.

---

[1] *State v. Ward*, 123 Wn.2d 488, 496, 869 P.2d 1062 (1994).

[2] (Emphasis added.)

¶17 Article I, section 21 provides that the "right of trial by jury shall remain inviolate . . . ." Under article I, section 22:

[i]n criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel, to demand the nature and cause of the accusation against him, to have a copy thereof, to testify in his own behalf, to meet the witnesses against him face to face, to have compulsory process to compel the attendance of witnesses in his own behalf, to have a speedy public trial by an impartial jury of the county in which the offense is charged to have been committed and the right to appeal in all cases.

¶18 We note that nowhere among the enumerated rights of section 22 is there any mention of either the quantum of proof required to show insanity or who bears that burden in a criminal prosecution.

██ ██ ¶19 State supreme court precedent makes clear that the rights provided for in the Washington Constitution are to be interpreted as they were at common law in the territory at the time of adoption of the state constitution in 1889.[3] Thus, we examine relevant authorities to determine whether the jury trial right in 1889 included a requirement that the State prove beyond a reasonable doubt that an accused was sane.

¶20 Haq does not cite any statutory authority that existed in 1889 to support his claim, nor was he able to state any during oral argument. We thus assume there was none at the time of the adoption of our state constitution.

¶21 Of the cases close to the time of statehood, two are particularly relevant in addressing this question of whether the government was required to prove the sanity of the accused. Likewise, these cases are also important in addressing whether proof beyond a reasonable doubt was the required quantum of proof.

---

[3] *City of Pasco v. Mace*, 98 Wn.2d 87, 96, 653 P.2d 618 (1982).

¶22 In 1904, 15 years after the adoption of the constitution, the supreme court decided *State v. Clark*.[4] There, a jury convicted Clark of first degree murder, and a court sentenced him to death.[5]

¶23 Clark and the female victim lived together in a house in Olympia.[6] A witness testified that early one morning she was awakened by Clark calling her in a muffled voice from the room where he and the victim slept.[7] The witness went to the door of the room, but the door was bolted shut.[8] After a short time, Clark succeeded in unbolting and opening the door.[9] When he did so, he fell and struck his head against the door jamb, apparently rendering himself unconscious.[10] Clark's hands, face, and clothes were covered in blood.[11] Inside the room, the victim was lying on the bed.[12] Her forehead was crushed and a long gash cut across her throat.[13]

¶24 At trial, Clark asserted an insanity defense.[14] He also testified in his defense.[15] He related his movements the previous day and evening before the victim's death.[16] He claimed not to recall that another trial witness had come into the bedroom the previous evening while the victim

---

[4] 34 Wash. 485, 76 P. 98 (1904).

[5] *Id.* at 487.

[6] *Id.*

[7] *Id.* at 487-88.

[8] *Id.* at 488.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.* at 488-89.

[15] *Id.* at 489.

[16] *Id.*

appeared to be alive.[17] He also claimed that he remembered someone " 'poking something down [his] throat' " and that he " 'came to and found [him]self lying in a strange bed just like a person would wake up out of a dream.' "[18]

¶25 On appeal following his conviction and sentence, he raised several claims of instructional error. Among them was the claim that the trial court erred by giving the jury the following instruction:

> "You are instructed that every man is presumed to be sane, and to intend the natural and usual consequences of his own acts. As the law presumes a man to be sane until the contrary is shown, *I charge you that the burden of proving insanity as a defense to a crime is upon the defendant to establish by a preponderance of the evidence, and unless insanity is established by a fair preponderance of the evidence the presumption of sanity must prevail.*"[19]

¶26 In deciding whether the instruction was legally correct, the supreme court surveyed the question of the quantum of proof required to establish insanity among the courts of many other states and the United States Supreme Court. After duly considering other jurisdictions' conflicting authorities over the quantum of proof needed to establish the defense of insanity, the court held:

> It is no injustice to a defendant to presume that [the defendant] is sane, and to require him to prove the unnatural condition of mind, which he alleges as a defense for a crime admitted . . . . Notwithstanding the weighty reasons advanced by the learned courts in the class first named, we desire to adopt the rule laid down by the trial court in this case [that insanity must be proved by the defense by a preponderance of the evidence].[20]

¶27 Thus, only 15 years after the adoption of the Washington Constitution, the supreme court decided that the

---

[17] *Id.* at 490.

[18] *Id.*

[19] *Id.* at 493 (emphasis added).

[20] *Id.* at 498.

quantum of proof required to establish insanity in this state was the preponderance of the evidence standard. Moreover, it also held that the defendant who claims the defense of insanity bears the burden of establishing this affirmative defense. [21]

¶28 It is significant that the supreme court surveyed the common law of other jurisdictions to decide these two questions in *Clark*. Had the court believed there was any settled common law in Washington on these questions, it would have said so. Yet, it did not. The limited discussion of Washington common law on this question, together with the court's decision to choose from competing lines of authority in other jurisdictions, greatly undermines the argument that Haq now makes on appeal. We conclude that there was no settled common law in Washington requiring the State to prove a defendant's sanity before the court decided *Clark*. Because this decision was merely 15 years after the adoption of the constitution, there is no reason to believe there was any common law on this question at the time of statehood.

¶29 The *Clark* case also casts doubt on some of the reasoning in the sole case on which Haq relies to advance his argument, *McAllister v. Territory*.[22]

¶30 The territorial supreme court decided *McAllister* 17 years before the adoption of the state constitution in 1889. McAllister was convicted in a lower court of second degree murder.[23] He and the victim, Walker, exchanged angry words in a saloon, and Walker struck McAllister in the forehead with a beer mug.[24] Walker quickly left the scene, and McAllister followed, with a pistol in hand.[25] McAllister

---

[21] *Id.* at 497-98.

[22] 1 Wash. Terr. 360 (1872).

[23] *Id.* at 361.

[24] *Id.* at 363-64.

[25] *Id.* at 364.

fired at Walker but missed.[26] Walker then grabbed McAllister, a scuffle ensued, and McAllister shot and killed Walker. [27]

¶31 McAllister was charged with first degree murder and pleaded not guilty by reason of insanity.[28] At issue on appeal from his conviction was whether the trial court committed error by giving a jury instruction that required McAllister to prove insanity by a preponderance of the evidence.[29]

¶32 In addressing this instruction, the territorial supreme court discussed the burden of proof in a passage of its opinion on which Haq heavily relies. The court stated:

The rule of law, as to the burden of proof in criminal cases we all agree, is this: The burden is on the Territory to make out every material allegation in the indictment beyond all reasonable doubt. The learned Judge who tried the cause in the District Court repeatedly, in the instructions given on his own motion, and in those asked on the part of the defendant, told the jury that such was the rule of law. The force and effect of this rule cannot be destroyed by any action of the prosecuting officer so far as the facts constituting the *res gestae* are

---

[26] *Id.*

[27] *Id.*

[28] *Id.* at 365.

[29] *Id.* at 365-66. The instruction stated:

"It is claimed by [McAllister] that at the time of the alleged shooting, by reason of a wound received upon his head, he was deprived of his reasoning faculties, and was not conscious of what he was doing, and did not know that he was committing a crime.

"This is a matter of defense that must be substantially proved by the defendant as an independent fact, and the burden is on the defendant to prove it.

"The law presumes a man sane and possessed of his reasoning faculties until the contrary is proved.

"And if in the case before you the killing be admitted, or clearly proved, then the defendant in order to excuse the same by reason of his being deprived of his reason at the time of said act, must satisfy you by the evidence of such fact, to wit: That at the time of the commission of said act, he was deprived of his reasoning faculties in so far as to be unconscious that he was committing a crime."

concerned. Part of the facts included in the *res gestae* may be developed by the Territory, and part by the defense, but still the rule is the same. The defendant is entitled to the instruction that the jury must be satisfied of his guilt beyond all reasonable doubt on all the facts so put in evidence, and so the jury were told, except as shown above. And we are satisfied that so far as the facts attending the killing are concerned—at least so far as those facts are included in the *res gestae*, that the burden of proof never shifts. This is as true of the defense of insanity under the limitations stated above, as of any other defense. But if insanity is set up as a separate and distinct defense, and its proof does not consist of the facts attending the killing, then the proof must be made out by the defendant, the legal presumption of sanity being sufficient for the indictment in the absence of all evidence to the contrary.[30]

¶33 In *Clark*, our state supreme court referred to the same passage of the *McAllister* case. After noting that each side cited *McAllister* in support of conflicting arguments, the *Clark* court stated:

The [*McAllister*] opinion is to the effect that when the proof of insanity is made as a part of the *res gestae*, the burden of proving insanity is not upon the State; but where the proof does not consist of facts attending the killing, then the burden of proving insanity is upon the defendant. It will be readily seen, therefore, why each side of this controversy claims the case as an authority in its favor. *But it is difficult to imagine a case where the slayer is insane and where the proof of insanity is not a part of the* res gestae, *but is independent of the facts attending the killing.*[31]

¶34 The last sentence of this quotation from *Clark* casts considerable doubt on the discussion in *McAllister* concerning who bears the burden of proving insanity. In 1904, the *Clark* court could not imagine a case where an accused is insane and proof of insanity is not a part of the res gestae. We have the same difficulty over 100 years later.

---

[30] *Id.* at 366.

[31] *Clark*, 34 Wash. at 495-96 (emphasis added).

¶35 To the extent the discussion in *McAllister* rests on the assumption that our state supreme court later questioned in *Clark*, that segment of *McAllister* holds little or no persuasive value. Thus, we cannot agree with Haq's reliance on *McAllister* as a correct statement of the common law in Washington in 1872 that the government bore any burden to prove sanity in a criminal case. More importantly, we reject his claim that the common law of the territory at the time of adoption of the state constitution in 1889 required the government to prove beyond a reasonable doubt that an accused was sane. Rather, the sanity of the accused was presumed, and the accused had the burden to prove by a preponderance of the evidence the affirmative defense of insanity.

¶36 There is an additional reason why Haq's reliance on *McAllister* is unpersuasive. The statement in the above passage on which he relies is dictum to the extent that it suggests that the government must prove beyond a reasonable doubt that an accused is sane. We draw this conclusion from the following passage in *Clark*:

> The [*McAllister*] court, however, in that case sustained the conviction upon an instruction substantially as in this case, **because it was held that the facts did not warrant any instruction upon the question of insanity**. . . .[32]

¶37 Our supreme court's statement in *Clark* further undermines Haq's reliance on *McAllister*. Because the *McAllister* court decided that there was no reason to give the insanity instruction based on a lack of evidence, its statement about who bears the burden of proof is not helpful.

¶38 *State v. Strasburg*,[33] which the supreme court decided six years after *Clark*, is also helpful to our assessment of Haq's claims. The criminal charge in that case was for

---

[32] *Id.* at 496 (emphasis added).

[33] 60 Wash. 106, 110 P. 1020 (1910).

first degree assault.[34] A jury convicted Strasburg as charged.

¶39 On appeal, he claimed that the trial court erred by refusing to admit evidence tending to prove that he was insane at the time of the commission of the charged crime.[35] The exclusion of that evidence at trial was based on a 1909 statute that barred the use of the defense of insanity to a criminal charge.[36]

¶40 It is noteworthy that Strasburg challenged the statute, in part, on the basis that it violated the right provided by article I, section 21, that the "jury trial shall remain inviolate," a right at issue in this case.[37] The supreme court held in *Strasburg* that the 1909 law was unconstitutional, but of particular note is the way in which the court expressed its holding:

> [I]t seems too plain for argument that *one accused of* [a] *crime had the right, prior to and at the time of the adoption of our constitution, to show, as a fact in his defense, that he was insane when he committed the act charged against him,* the same as he had the right to prove any other fact tending to show that he was not responsible for the act. Indeed, his right to prove his insanity at the time of committing the act was as perfect even as his right to prove that his physical person did not commit the act, or set in motion a chain of events resulting in the act.[38]

This language reinforces our view that the common law at the time of the adoption of our state constitution placed the burden of proving insanity on the accused.

¶41 *Clark* and *Strasburg* make clear that the accused bears the burden of proving this affirmative defense. Like-

[34] *Id.* at 110.

[35] *Id.* at 111-12.

[36] *Id.*

[37] *Id.* at 112.

[38] *Id.* at 115-16 (emphasis added).

wise, the cases also show that the quantum of proof required to prove insanity has been a preponderance of the evidence at least since *Clark* and as far back as *McAllister*.[39] There is no reason to conclude that the common law was any different at the time of adoption of our state constitution in 1889, 15 years before the *Clark* decision and 21 years before *Strasburg*.

¶42 Haq next argues that a *Gunwall* analysis of article I, sections 21 and 22, shows that the government must prove beyond a reasonable doubt that an accused is sane.[40] We disagree.

¶43 The United States Supreme Court has held that state constitutions may provide greater protections than those afforded under the federal constitution.[41] To assess whether Washington's Constitution provides such broader protections, we apply the analysis enunciated in *Gunwall*.[42] "In assessing whether the Washington Constitution affords greater protection of a right than the federal constitution, this court's decision in *Gunwall* requires the consideration of six factors: (1) textual language, (2) differences between the texts, (3) constitutional history, (4) preexisting state law, (5) structural differences, and (6) matters of particular state or local concern."[43] The supreme court has held that the language of the Washington Constitution, its structure, and its textual difference from the United States Constitution all indicate that "Washington's right to a jury trial [is broader] than the federal right."[44] But, "[e]ven if the right to

---

[39] *See Clark*, 34 Wash. at 496.

[40] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

[41] *State v. Smith*, 150 Wn.2d 135, 149, 75 P.3d 934 (2003).

[42] 106 Wn.2d 54.

[43] *Smith*, 150 Wn.2d at 149.

[44] *Id.* at 152.

jury trial is broader under our state constitution, we still must determine the nature and extent of the right." [45]

¶44 Though article I, section 21, contains the term "inviolate," which indicates a broader state jury trial right under the first *Gunwall* factor,[46] none of the factors indicate that this right encompasses the allocation of the burden of proof. The right to a jury trial is contained in two Washington constitutional provisions rather than the federal constitution's one. But, as the *Smith* court noted, "[T]his fact fails to provide guidance as to the **scope of that right**. . . . [T]he extent of the right must be determined from the law and practice that existed in Washington at the time of our constitution's adoption in 1889."[47] Most importantly, there is neither constitutional history nor preexisting state law supporting the conclusion that a broader right to a jury trial encompassed the allocation of the burden of proof regarding sanity.

¶45 *McAllister* is not helpful, and Haq does not point to any other case or statute that supports his argument. Nor have we found any support for a claim that such a burden is of particular state or local concern. Though article I, sections 21 and 22 may be more protective than the federal right to a jury trial,[48] Haq must still show that his claims fall within this broader scope of the jury trial right. He has failed to do so.

¶46 Haq argues that the supreme court's holding in *Strasburg* makes clear that the allocation of the burden of proof in insanity cases as it currently stands is unconstitutional. But, *Strasburg* did not address the specific issue argued by Haq, except to say, as we noted earlier, that one accused of a crime had the right to allege an insanity

---

[45] *Id.* at 153.

[46] *Id.* at 149-50.

[47] *Id.* at 151 (emphasis added).

[48] *See id.* at 149-50.

defense.[49] The *Strasburg* court considered a statute passed by the legislature that prevented a defendant from entering a plea of insanity.[50] The court held that

> [t]he right of trial by jury must mean that the accused has the right to have the jury pass upon every substantive fact going to the question of his guilt or innocence. . . .
>
> ". . . [I]t would be entirely feasible for a state legislature . . . to impose such onerous and oppressive restrictions . . . upon this right as to make it practically unavailing to a party . . . . But this would be a palpable violation of the spirit and intent of the constitutional provision . . . ."[51]

But, imposing the burden of proof, as here, is not so onerous or oppressive as to deprive Haq of the right to have the jury determine whether he was insane. The right to due process discussed in *Strasburg* is not helpful in deciding the separate question of the scope of the jury trial right under our state constitution.

¶47 Nor is Haq's reliance on *Apprendi v. New Jersey*[52] persuasive. In *Apprendi*, the United States Supreme Court stated that " '[i]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.' "[53] But, requiring a defendant to prove insanity by a preponderance of the evidence does not remove an issue from the jury's purview, and thus *Apprendi* is not applicable here.

¶48 In sum, Haq fails in his burden to prove beyond a reasonable doubt that the statutes he challenges are un-

[49] *Strasburg*, 60 Wash. at 119-20.

[50] *Id.* at 111-12.

[51] *Id.* at 118-19 (quoting HENRY CAMPBELL BLACK, HANDBOOK OF AMERICAN CONSTITUTIONAL LAW 519 (2d ed. 1897)).

[52] 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

[53] *Id.* at 490 (alteration in original) (quoting *Jones v. United States*, 526 U.S. 227, 252, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999) (Stevens, J., concurring)).

constitutional. Accordingly, we reject his claim that his convictions should be overturned on this basis.

## *Separation of Powers*

¶49 For the first time on appeal, Haq argues that RCW 10.77.020(5) is unconstitutional because it violates the separation of powers inherently required by the Washington Constitution. Specifically, he claims that the statute, which mandates exclusion of evidence of insanity upon a failure of a defendant to agree to a court-ordered mental health examination, is an unconstitutional infringement on the courts' power. According to Haq, admission or exclusion of evidence is exclusively a judicial function. Because Haq did not raise this issue below, and cannot show that this claimed error is "manifest" under Rule of Appellate Procedure 2.5(a), we do not reach the merits of this claim.

¶50 Under RAP 2.5(a)(3), an issue first raised on appeal may be reviewed by an appellate court where it is a manifest error affecting a constitutional right. This court outlined the analytical steps under RAP 2.5(a)(3) in *State v. Lynn.*[54]

> First, the reviewing court must make a cursory determination as to whether the alleged error in fact suggests a constitutional issue. Second, the court must determine whether the alleged error is manifest. Essential to this determination is a plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case. Third, if the court finds the alleged error to be manifest, then the court must address the merits of the constitutional issue. Finally, if the court determines that an error of constitutional import was committed, then, and only then, the court undertakes a harmless error analysis.[55]

In determining whether the error's consequences were identifiable, the trial record must be sufficient to determine

---

[54] 67 Wn. App. 339, 835 P.2d 251 (1992).

[55] *Id.* at 345.

the merits of the claim.[56] "If the facts necessary to adjudicate the claimed error are not in the record on appeal, no actual prejudice is shown and the error is not manifest." [57]

¶51 In *State v. McFarland*,[58] the defendants argued, for the first time on appeal, that the court's failure to suppress evidence obtained from a warrantless arrest was improper.[59] The supreme court held that to show actual prejudice,

> [e]ach Defendant . . . must show the trial court likely would have granted the motion [to suppress] if made. It is not enough that the Defendant allege prejudice—actual prejudice must appear in the record. In each case, because no motion to suppress was made, the record does not indicate whether the trial court would have granted the motion. Without an affirmative showing of actual prejudice, the asserted error is not "manifest" and thus is not reviewable under RAP 2.5(a)(3).[60]

¶52 CrR 4.7(b)(2)(viii) provides the court with discretion to require the defendant to "submit to a reasonable physical, medical, or psychiatric inspection or examination." The supreme court has held that CrR 4.7 provides courts the power to compel a defendant to submit to a court-ordered mental health examination by a state expert if he asserts an insanity defense.[61] Further, if a defendant refuses to submit to such an examination, the supreme court has concluded that the trial court may exclude defense expert witness testimony on the defendant's insanity and diminished capacity.[62]

---

[56] *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995).

[57] *Id.*

[58] 127 Wn.2d 322, 899 P.2d 1251 (1995).

[59] *Id.* at 333-34.

[60] *Id.* (footnote omitted)

[61] *State v. Hutchinson*, 111 Wn.2d 872, 881-83, 766 P.2d 447 (1989).

[62] *State v. Hutchinson*, 135 Wn.2d 863, 882-83, 959 P.2d 1061 (1998).

¶53 In this case, Haq fails to show actual prejudice. CrR 4.7 alone would have permitted the court, in the proper exercise of its discretion, to exclude Haq's defense witness testimony had he refused to comply with a court-ordered examination. There would have been no need to consider the effect of the statute Haq now challenges for the first time on appeal.

¶54 Haq argues that he "vigorously sought to preclude a *compelled* mental examination conducted by a state-retained expert." He also claims that as part of this challenge below, he argued that RCW 10.77.020(5) "impermissibly required a defendant to exercise his right to self-incrimination. . . ."[63] However, that is not the substance of his claim here.[64] Thus, Haq's argument fails to meet the burden required by RAP 2.5(a)(3) to show actual prejudice.

¶55 Haq argues that *State v. Ramos*[65] and *State v. Aguirre*[66] are akin to his case and, thus, that he may raise this issue for the first time on appeal. But these cases are not persuasive. In *Ramos*, the court merely quoted RAP 2.5(a)(3) in a footnote and summarily noted that "Ramos raises this constitutional argument, as he may, for the first time on appeal."[67] In *Aguirre*, the court noted the limited nature of RAP 2.5(a)(3) but then employed its discretionary power and reviewed the State's separation of powers argument.[68] Further, in both cases, the statute being challenged was the basis for the convictions in question. Here, Haq's constitutional challenge regards an aspect of discovery, not

---

[63] Reply Br. of Appellant at 24.

[64] *See State v. Carneh*, 153 Wn.2d 274, 282, 103 P.3d 743 (2004) (holding that court-ordered examinations of those defendants who plead insanity and the admission of this examination is not an infringement of the defendant's Fifth Amendment rights).

[65] 149 Wn. App. 266, 202 P.3d 383 (2009).

[66] 73 Wn. App. 682, 871 P.2d 616 (1994).

[67] *Ramos*, 149 Wn. App. at 270 n.2.

[68] *Aguirre*, 73 Wn. App. at 687-88.

the basis for his actual conviction, and thus is distinguishable from both *Aguirre* and *Ramos*.

¶56 Accordingly, we do not reach the substantive question of whether RCW 10.77.020 is unconstitutional because it violates the separation of powers.

### *Recording of Jail Telephone Calls as a Violation of Right to Counsel*

¶57 Haq next claims that the recording of King County jail inmates' telephone conversations and the supplying of these recordings to the prosecution as an investigative tool violates his Sixth Amendment right to counsel. We disagree.

¶58 The Sixth Amendment to the United States Constitution guarantees "[i]n all criminal prosecutions, the accused shall . . . have the assistance of counsel for his defense." The United States Supreme Court has held that a person's right to counsel attaches " 'at or after the time that judicial proceedings have been initiated [against him].' "[69] Once this right attaches, the government may not interrogate a defendant without his waiver of counsel.[70] When the State knowingly exploits " '*an opportunity to confront the accused without counsel being present,*' " its actions are " '*as much a breach of the State's obligation not to circumvent the right to assistance of counsel as is the intentional creation of such an opportunity.*' "[71] Such knowing exploitation, or "deliberate elicitation," has been found to occur where (1) a codefendant becomes a government informant and transmits his conversations to the police (whether such transmission occurred after a meeting

[69] *Fellers v. United States*, 540 U.S. 519, 523, 124 S. Ct. 1019, 157 L. Ed. 2d 1016 (2004) (quoting *Brewer v. Williams*, 430 U.S. 387, 398, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977)).

[70] *Brewer*, 430 U.S. at 401.

[71] *State v. Sargent*, 111 Wn.2d 641, 645-46, 762 P.2d 1127 (1988) (some emphasis added) (quoting *Maine v. Moulton*, 474 U.S. 159, 176, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985)).

initiated by the government agent or a codefendant)[72] and (2) where a fellow prisoner engages in conversation with the defendant after he is told by government officials to be alert to any incriminating statements made by the defendant. [73]

¶59 Here, it is undisputed that the right to counsel had attached at the time of Haq's calls to his family. It is also undisputed that the government did not interrogate Haq during these telephone conversations. He was talking to family members, and there is no suggestion that they were government agents who questioned their son on behalf of the State.

¶60 This case is analogous to *United States v. Hearst*.[74] There, while in custody, the defendant

> communicated [with a visitor] over a telephone-like intercommunication system . . . . Most of the conversation between the two was monitored and recorded through a switchboard-type device operated by a deputy sheriff. . . . Officials at the jail had previously determined to record all of appellant's conversations with her visitors in accordance with the jail policy . . . .
>
> The jail supervisor delivered the recording of the conversation . . . to the [Federal Bureau of Investigation (FBI)] and the prosecution.[75]

¶61 Hearst argued that his case was comparable to *Massiah v. United States*.[76] There, the defendant made incriminating statements to a fellow conspirator, who had agreed to work with government agents and had been instructed to engage Massiah in conversation.[77] The government agents listened to these conversations over a radio

---

[72] *See Massiah v. United States*, 377 U.S. 201, 204-05, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964); *Moulton*, 474 U.S. at 174-75.

[73] *See United States v. Henry*, 447 U.S. 264, 271-72, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980).

[74] 563 F.2d 1331 (9th Cir. 1977), *cert denied*, 435 U.S. 1000 (1978).

[75] *Id.* at 1344.

[76] 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964).

[77] *Id.* at 202-03.

transmitter.[78] The *Hearst* court held there was no violation of the *Massiah* rule. "The obvious problem with applying *Massiah* to the facts surrounding the making of the . . . tape is the **absence of any governmental effort to elicit incriminating statements from appellant**."[79] The court held that interrogation is a prerequisite for a Sixth Amendment violation as no such protection of the right to assistance of counsel comes into play if there is no interrogation.[80]

¶62 Additionally, our state supreme court has noted that for there to be a Sixth Amendment violation, there must be an agency relationship between an informant and the government, such that "there [is] at least an implicit agreement between the parties with respect to the current undertaking. Furthermore, the principal must have the ability to control that undertaking."[81]

¶63 As we have explained, the phone recordings that were admitted into evidence at trial were between Haq and his parents. Neither parent agreed to work with the government to elicit information. The telephone records were neither a product of interrogation nor an investigatory technique that otherwise sought to circumvent Haq's right to counsel. Thus, Haq's statements during the recorded telephone conversations did not violate his Sixth Amendment right to counsel.

¶64 Haq argues that the psychological impact of his solitary confinement should support a finding that the recording of his phone calls to his parents was a forced suspension of his Sixth Amendment right. Though the

---

[78] *Id.*

[79] *Hearst*, 563 F.2d at 1347 (emphasis added).

[80] *Id.* at 1348.

[81] *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 912, 952 P.2d 116 (1998) (citations omitted).

Supreme Court in *United States v. Henry*[82] did acknowledge the potential psychological effects of confinement, it did so in the context of "ploys of undercover Government agents."[83] Here, there was no undercover agent engaging in any ploys. Haq's family was clearly and explicitly told prior to each conversation that their conversations could be recorded, and Haq was informed of the same facts in writing.

¶65 Haq also relies on the United States Supreme Court's statement in *Maine v. Moulton*:[84] "knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity."[85] But, nowhere in *Massiah*, *Moulton*, or *Henry* did the Court suggest that passive listening by the government to conversations of a pretrial detainee is violative of his Sixth Amendment right. In fact, in *Henry*, the Court noted that "[t]he situation where the 'listening post' is an inanimate electronic device differs; such a device has no capability of leading the conversation into any particular subject or prompting any particular replies."[86] The Court reiterated this distinction in *Moulton*, distinguishing between the actions of the government informant in the case, who had " 'frequently pressed Moulton for details' " and "the 'listening post,' " which "cannot or does not participate in active conversation and prompt particular replies."[87]

¶66 Haq argues that by recording and listening to the phone calls, the King County jail employees acted as

---

[82] 447 U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980).

[83] *Id.* at 273-74.

[84] 474 U.S. 159, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985).

[85] *Id.* at 176.

[86] *Henry*, 447 U.S. at 272 n.9.

[87] *Moulton*, 474 U.S. at 177 n.13 (quoting *State v. Moulton*, 481 A.2d 155, 161 (Me. 1984)).

government agents. They are government agents, but that fact is not analytically helpful. The United States Supreme Court has held that mere government agent interaction with a pretrial detainee does not itself violate a defendant's right to counsel.[88] Recording of telephone conversations under the procedures here is simply an interaction, nothing more. Consequently, we reject Haq's argument.

### *Recording of Jail Telephone Calls as a Violation of Equal Protection*

¶67 Haq contends that the recording policies of King County jail, as compared to the policies in place in the Department of Corrections' (DOC) facilities, violated his Fourteenth Amendment right to equal protection. This argument is unpersuasive.

¶68 The equal protection clauses of the Fourteenth Amendment to the United States Constitution and article I, section 12 of the Washington Constitution require that people similarly situated under the law receive similar treatment from the State.[89] In order to determine whether a state action violates equal protection, one of three different bases of review is employed—strict scrutiny, intermediate scrutiny, or rational basis review.[90] The appropriate level of scrutiny depends upon the nature of the alleged classification and the rights involved.[91] Suspect classifications (such as race, alienage, and national origin) are subject to strict scrutiny.[92] Strict scrutiny also applies to

---

[88] *Kuhlmann v. Wilson*, 477 U.S. 436, 460, 106 S. Ct. 2616, 91 L. Ed. 2d 364 (1986) (where the government agent did not ask questions of the defendant but " 'only listened' to respondent's 'spontaneous' and 'unsolicited' statements," no Sixth Amendment violation occurred).

[89] *State v. W.W.*, 76 Wn. App. 754, 758, 887 P.2d 914 (1995).

[90] *State v. Harner*, 153 Wn.2d 228, 235-36, 103 P.3d 738 (2004).

[91] *State v. Hirschfelder*, 170 Wn.2d 536, 550, 242 P.3d 876 (2010).

[92] *Id.*

laws burdening fundamental rights or liberties.[93] Interme-
diate scrutiny applies only if the statute implicates both an
important right and a semisuspect class not accountable for
its status.[94] Absent a fundamental right or suspect class, or
an important right or semisuspect class, a law will be
upheld under rational basis review so long as it bears a
rational relation to some legitimate end.[95]

¶69 Haq argues that the King County jail
recording and dissemination policies infringe his funda-
mental right to privacy and counsel. We have already
rejected the claim that there is any violation of his Sixth
Amendment right to counsel. Further, for reasons that we
explain later in this opinion, there is no violation of any
right to privacy that he could claim as a prisoner in the jail.
Thus, the recording and dissemination of his phone calls do
not implicate a fundamental right and consequently do not
require strict scrutiny.

¶70 Haq does not allege that he is part of either a
suspect or semisuspect class. Consequently, we apply ratio-
nal basis review to the King County jail recording policy.
Rational basis review requires only that the governmental
action in question bear a rational relation to some legiti-
mate end.[96] Safety, security, and the right of government to
reduce criminal activity are all legitimate ends that support
the King County jail regulations.[97] Thus, Haq fails to show
any violation based on rational basis review.

¶71 Additionally, even if strict scrutiny were to
apply to the governmental actions here, it is not clear that
Haq is similarly situated to those held in the DOC's
facilities. For a court to engage in equal protection analysis,

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Am. Legion Post No. 149 v. Dep't of Health*, 164 Wn.2d 570, 604-05, 192 P.3d
306 (2008).

[97] *See Bell v. Wolfish*, 441 U.S. 520, 540, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979).

the individual alleging a violation must establish that he or she is similarly situated with other persons in a class.[98] Thus, in *State v. Osman*,[99] the court noted that to make his equal protection claim, the defendant must "first establish his classification by showing he was treated differently from others who were similarly situated."[100] Additionally, in *Harmon v. McNutt*,[101] where requirements for transfer to mental health facilities were applied differently as between prisoners and nonprisoners,[102] the supreme court concluded that "[w]e need not address defendant's contention that there is a rational basis for classification between prisoners and nonprisoners . . . . Rather, we need only to look at the treatment afforded persons who, like plaintiff, are enmeshed in and subject to the criminal justice system."[103]

¶72 The court's analysis in *Osman* and *Harmon* is persuasive here. Haq's equal protection claim is based on an argument that he is similarly situated to those held at Washington DOC penal institutions. He is not. Haq notes in his opening brief that

> it is safe to presume that [individuals at the DOC] have already been convicted and therefore the investigation would not be for the crime of which they were convicted; but rather a new and separate allegation—a significant difference than the broad position taken by King County Jail [where individuals may be investigated for ongoing prosecutions].[104]

---

[98] *State v. Osman*, 157 Wn.2d 474, 484, 139 P.3d 334 (2006); *see also In re Interest of J.R.*, 156 Wn. App. 9, 20, 230 P.3d 1087 (quoting *State v. Handley*, 115 Wn.2d 275, 289-90, 796 P.2d 1266 (1990)), *review denied*, 170 Wn.2d 1006 (2010).

[99] 157 Wn.2d 474, 139 P.3d 334 (2006).

[100] *Id.* at 485.

[101] 91 Wn.2d 126, 130, 587 P.2d 537 (1978).

[102] *Id.*

[103] *Id.*

[104] Opening Br. of Appellant at 65.

This difference does not support Haq's equal protection claim but instead highlights that those under the aegis of the DOC are not similarly situated to him. Thus, Haq's claim fails.

¶73 Finally, it is not clear that differential treatment does exist between those inmates at King County jail and DOC facilities. RCW 9.73.095(3)(b), which governs the DOC's recording of inmates' phone conversations, states that "[t]he contents of any intercepted and recorded conversation shall be divulged only as is necessary to safeguard the orderly operation of the correctional facility, in response to a court order, *or in the prosecution or investigation of any crime*."[105] Though Haq is likely correct that such investigation does not involve prior convictions, the provision still allows for use of phone calls for reasons other than safety and security of the correctional institution itself. This is consistent with the use of Haq's recorded conversations while incarcerated in the King County jail as evidence at his second trial.

¶74 To summarize, Haq fails to demonstrate that the King County jail's recording of his phone calls violates his right to equal protection under the laws.

### Dissemination of Jail Telephone Calls as a Violation of Right to Privacy

¶75 Haq argues that dissemination of his telephone calls to the King County prosecutor violated his right to privacy under article I, section 7 of the Washington Constitution. We hold that under the circumstances here, such dissemination was not a constitutional violation.

¶76 Article I, section 7 provides that "[n]o person shall be disturbed in his private affairs ... without authority of law." "In determining whether a certain interest is a private affair deserving article I, section 7 protection, a central

---

[105] (Emphasis added.)

consideration is the **nature** of the information sought—
that is, whether the information obtained . . . reveals
intimate or discrete details of a person's life."[106] Article I,
section 7, provides protections that are "qualitatively dif-
ferent from, and in some cases broader than, those provided
by the Fourth Amendment."[107] But, this court found in
*State v. Archie*[108] that it does not apply to either agreed to
recordings or to the dissemination of a jail inmate's calls.[109]

¶77 In *Archie*, the defendant was charged with burglary
and assault and held in pretrial detention in King County
jail.[110] Prior to trial, the court issued a no-contact order,
which Archie violated by telephoning his victim.[111] These
recordings were admitted as evidence at trial.[112] Posted
near the jail's telephones were signs warning that all calls
were subject to recording and monitoring.[113] Further, when
Archie's calls were answered, a recorded message stated:

> "Hello, this is a call at no expense to you from [(name of
> inmate . . . )] [an] inmate at the King County Detention Facility.
> This call will be recorded and subject to monitoring at any time.
> To accept this call, dial three. To refuse this call, dial nine or
> hang up now. . . ."[114]

---

[106] *State v. Jorden*, 160 Wn.2d 121, 126, 156 P.3d 893 (2007) (some emphasis added) (citing *State v. Jackson*, 150 Wn.2d 251, 262, 76 P.3d 217 (2003)).

[107] *City of Seattle v. McCready*, 123 Wn.2d 260, 267, 868 P.2d 134 (1994) (citing *City of Seattle v. Mesiani*, 110 Wn.2d 454, 456, 755 P.2d 775 (1988)); *Gunwall*, 106 Wn.2d at 65; *State v. Stroud*, 106 Wn.2d 144, 148, 720 P.2d 436 (1986).

[108] 148 Wn. App. 198, 199 P.3d 1005, *review denied*, 166 Wn.2d 1016 (2009).

[109] *Id.* at 203-04.

[110] *Id.* at 200.

[111] *Id.* at 200-01.

[112] *Id.* at 201.

[113] *Id.*

[114] *Id.* (alterations in original).

Despite these warnings, Archie argued the recording and use of such recording at trial violated his right to privacy under article I, section 7.[115] But, this court held:

> Balancing the circumstances here against the privacy protection usually applied to telephone communications, we are persuaded that Archie's phone calls from the jail were not private affairs deserving of article I, section 7 protection.
>
> Further, where one participant in a conversation has consented, the recording does not violate article I, section 7.[116]

¶78 Haq's case is analogous to *Archie*. Haq was also a pretrial detainee held in King County jail. He, too, passed the signs posted near the telephones advising him that his conversations would be monitored and recorded. His parents heard the recorded warning prior to every phone call. And his recorded conversations were admitted as evidence at trial, like Archie's. Consequently, Haq's privacy rights under the Washington Constitution were not violated by the admission of the telephone recordings into evidence at trial.

¶79 Haq argues that the disclosure of his jail calls to the prosecutor's office "solely for investigative purpose" distinguishes his case from *Archie*. In *Archie*, Haq argues, the monitoring and release of the defendant's phone calls served the legitimate basis of prevention of any ongoing criminal conduct, while Haq's conversations did not contain any indication of such conduct. This may be so, but the *Archie* decision did not rest on the ongoing criminal conduct of Archie. Instead, the holding in *Archie* was based on the defendant's limited privacy rights as a detainee, combined with warnings of possible recording.[117] Thus, Haq's analy-

---

[115] *Id.* at 200.

[116] *Id.* at 204.

[117] *Id.* at 203-05.

sis is not persuasive. Further, like the defendant in *Archie*, Haq had a no-contact order in place.[118]

¶80 While there may be limits to the State's use of jail telephone recordings, we are not confronted here with a case that demands us to define what they are. Given the legitimate penal interests of the King County jail and Haq's limited privacy rights as a detainee, recording and admission into evidence of his phone conversations with his parents did not violate his right to privacy.

## PRIVACY ACT

¶81 Haq argues that the delivery of recordings of his telephone calls to the King County prosecutor violated the privacy act. He is mistaken.

¶82 Under the Washington privacy act:

(1) . . . it [is] unlawful for any individual, partnership, corporation, association, or the state of Washington . . . to intercept, or record any:

(a) Private communication transmitted by telephone . . . between two or more individuals . . . without first obtaining the consent of all the participants in the communication.[119]

¶83 In *State v. Modica*,[120] the Supreme Court held that the recording of a Washington inmate's telephone conversations did not violate RCW 9.73.030. There, the defendant challenged the admission of telephone conversations recorded at the King County jail, the same jail that is at issue in this case. The court first determined the definition of "privacy" under RCW 9.73.030. A " 'communication is private (1) when parties manifest a subjective intention that it be private and (2) where that expectation is reason-

---

[118] Clerk's Papers at 24 (under the terms of the no-contact order, Haq was not to contact any employees of the Jewish Federation).

[119] RCW 9.73.030.

[120] 164 Wn.2d 83, 186 P.3d 1062 (2008).

able.' "[121] It then went on to hold that Modica's expectation of privacy was unreasonable and thus not protected.[122]

> First, we have already held that inmates have a reduced expectation of privacy. Second, both Modica and his grandmother knew they were being recorded . . . .
>
> . . . [B]ecause Modica was in jail, because of the need for jail security, and because Modica's calls were not to his lawyer or otherwise privileged, we conclude he had no reasonable expectation of privacy.[123]

¶84 *Modica* controls here. Haq, like Modica, was an inmate in King County jail. Thus, he had a reduced expectation of privacy. He was also warned that his calls would be recorded. Under *Modica*, Haq did not have a reasonable expectation of privacy and thus his conversations are not protected by the Washington privacy act.

¶85 Haq attempts to distinguish his case from *Modica*, arguing that the dissemination of his conversations was requested by the prosecutor's office for investigation, not because of safety concerns. It is true that the supreme court noted that jail security was a consideration that diminished the expectation of privacy in *Modica*.[124] But, as can be seen from the language above, the security rationale was only one of several reasons on which the court relied for its holding. Haq presents no authority that safety is the only reason a prosecutor can request and introduce jail telephone recordings. The recording of Haq's phone calls and their admission into evidence at trial did not violate the Washington privacy act.

---

[121] *Id.* at 88 (quoting *State v. Christensen*, 153 Wn.2d 186, 193, 102 P.3d 789 (2004)).

[122] *Id.*

[123] *Id.* at 88-89 (citation omitted).

[124] *Id.* at 89.

## EVIDENTIARY RULINGS: ADMISSION OF
## TELEPHONE RECORDINGS

¶86 Haq argues that the trial court abused its discretion in admitting the jail phone records because they were more prejudicial than probative. The court properly exercised its discretion by admitting these records.

 ¶87 Relevant evidence is admissible under Evidence Rule (ER) 401 where it has any tendency to make the existence of a fact that is "of consequence to the determination of the action" more or less probable.[125] However, under ER 403, evidence whose probative value is outweighed by its potential prejudice should not be admitted. " '[U]nfair prejudice is that which is more likely to arouse an emotional response than a rational decision by the jury' [and which creates] an undue tendency to suggest a decision on an improper basis . . . ."[126] As this court made clear in *State v. Bernson*,[127]

> [i]n applying ER 403 . . . the linchpin word is "unfair." In almost any instance, a defendant can complain that the admission of potentially incriminating evidence is prejudicial in that it may contribute to proving beyond a reasonable doubt he committed the crime with which he is charged. Addition of the word "unfair" to prejudice obligates the court to weigh the evidence [seen] in the context of the trial itself, bearing in mind fairness to both the State and the defendant.[128]

 ¶88 A trial court's evidentiary rulings are generally reviewed for abuse of discretion.[129] A trial court abuses its

---

[125] *State v. Hughes*, 106 Wn.2d 176, 201, 721 P.2d 902 (1986).

[126] *State v. Cronin*, 142 Wn.2d 568, 584, 14 P.3d 752 (2000) (quoting *State v. Gould*, 58 Wn. App. 175, 183, 791 P.2d 569 (1990) and citing *State v. Cameron*, 100 Wn.2d 520, 529, 674 P.2d 650 (1983)).

[127] 40 Wn. App. 729, 700 P.2d 758 (1985).

[128] *Id.* at 736.

[129] *Sintra, Inc. v. City of Seattle*, 131 Wn.2d 640, 662-63, 935 P.2d 555 (1997).

discretion "if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons."[130]

¶89 Here, the phone conversations between Haq and his family referenced other acts of terrorism, jihadis, and hate mail that Haq received. The trial court held that these conversations were reflective of "[w]hat was in Mr. Haq's mind at the time of the shootings" and thus highly relevant.[131] Haq does not dispute this part of the court's evidentiary ruling.

¶90 Haq does argue that the admission of these statements was more prejudicial than probative, given national fears regarding terrorism. But, as Haq himself notes, "[I]t was undisputed that neither the Seattle Police nor the FBI found any links between Mr. Haq and any terrorist group."[132] A stipulation to that effect was read to the jury.[133] Given this stipulation, and the relevance of Haq's comments to his mental state and intent, the court properly exercised its discretion by admitting the telephone recordings into evidence.

## EVIDENTIARY RULINGS: POLICE AND EXPERT TESTIMONY

¶91 Haq also argues that testimony of four state witnesses was so unfairly prejudicial that it invaded the province of the jury and thus deprived him of a fair trial. We disagree.

¶92 The right to a jury trial is guaranteed by both the Washington and United State Constitutions.[134] A crucial aspect of this right is the right of a defendant to

---

[130] *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

[131] Report of Proceedings (Oct. 26, 2009) at 169.

[132] Opening Br. of Appellant at 74.

[133] Report of Proceedings (Nov. 24, 2009) at 78.

[134] WASH. CONST. art. I, § 21; U.S. CONST. amend. VI.

have a jury decide factual questions at issue in his case.[135] Thus, "witnesses should not tell the jury what result to reach" as such testimony impinges on the province of the jury.[136] In determining whether a lower court abused its discretion by admitting witness testimony that infringed the province of the jury, "the court will consider the circumstances of the case, including the following factors: '(1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact.' "[137]

## Objections Preserved at Trial

¶93 Previously objected to testimony is reviewed for abuse of discretion.[138] A trial court abuses its discretion only when its decision is manifestly unreasonable or based on untenable grounds.[139]

¶94 Here, Haq asserts that Detective Al Cruise's opinion testimony, to which Haq objected at trial, invaded the province of the jury and deprived him of a fair trial. Detective Cruise testified that "it was apparent to me that [Haq] wasn't acutely insane."[140] While Detective Cruise's statement did go to the ultimate issue in the case, the court sustained Haq's objection and struck the testimony.[141] Further, prior to deliberations, the jury was instructed that

---

[135] *See Goodman v. Goodman*, 128 Wn.2d 366, 373, 907 P.2d 290 (1995); *see also Edgar v. City of Tacoma*, 129 Wn.2d 621, 631, 919 P.2d 1236 (1996).

[136] *State v. Montgomery*, 163 Wn.2d 577, 590-91, 183 P.3d 267 (2008) (citing *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 656, 771 P.2d 711 (1989)).

[137] *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007) (internal quotation marks omitted) (quoting *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001)).

[138] *State v. Finch*, 137 Wn.2d 792, 810, 975 P.2d 967 (1999).

[139] *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

[140] Report of Proceedings (Nov. 2, 2009) at 43.

[141] *Id.*

it was the sole judge of the credibility of witnesses. Courts generally presume jurors follow instructions to disregard improper evidence.[142] Therefore, Detective Cruise's statement does not require reversal.

¶95 Haq argues that Detective Cruise's statement was "the type of opinion testimony likely to remain in the minds of the jury" and points out that Washington's courts have noted that "police officers' testimony carries an 'aura of reliability.' "[143] But, where testimony more egregious than here has been objected to and struck by the trial court, the defendant's constitutional rights have not been abridged.[144] Thus, Haq's argument fails.

¶96 Haq also contends that Dr. Victor Reus's testimony that Haq was "shooting . . . with intent" was not cured by the court's instructions to the jury. Dr. Reus described Haq's actions at the Jewish Federation, stating, "[H]e then proceeds to shoot people pretty systematically going from office to office and shooting. Going back and shooting several people twice. He's shooting, I think, with intent at . . . ."[145] The defense objected.[146] The court then instructed the jury that

> before you stepped out, I granted the defense objection and struck the testimony as to whether or not Dr. Reus concluded that Mr. Haq acted with intent or not. I did that because witnesses, experts or otherwise, are not allowed to testify as to whether Mr. Haq actually premeditated or formed any specific mental state. That's a question reserved solely for the jurors in this case. Instead an expert's testimony is limited to whether a

---

[142] *State v. Swan*, 114 Wn.2d 613, 661, 790 P.2d 610 (1990), *cert. denied*, 498 U.S. 1046 (1991).

[143] Opening Br. of Appellant at 101; *see also Montgomery*, 163 Wn.2d at 595.

[144] *See State v. Copeland*, 130 Wn.2d 244, 284, 922 P.2d 1304 (1996) (court upheld conviction where prosecutor asked a key defense witness, " 'You beat her . . . black and blue and you burned her abdomen with a cigar, didn't you?' ").

[145] Report of Proceedings (Dec. 2, 2009) at 30.

[146] *Id.*

defendant has the capacity or ability to form a specific mental state.

With that clarification, and having sustained the defense objection, we'd [sic] return to the questioning.[147]

Though Dr. Reus's statement was improper, the court correctly dealt with the error. It not only instructed the jury to disregard the statement but also explained why it should do so. Because juries are presumed to follow the court's instructions,[148] Dr. Reus's testimony did not deprive Haq of his right to a jury trial.

¶97 Additionally, Haq contends that Dr. Reus's stricken testimony regarding bipolar individuals denied him a fair trial. When asked whether he was familiar with those with bipolar disorder, Dr. Reus responded that he was:

People might have remembered the movie of Jonathan Nash, a guy who won a Nobel prize who had bipolar disorder or schizophrenia. . . . I mean, I have had patients in my practice who—and do currently actually who are functioning as surgeons. I have a person who's functioning as a judge who carries a bipolar diagnosis. So—and when I was in [Washington] D.C., you know, several of my mentors there were treating members of the U.S. congress [sic] with bipolar disorder.[149]

The trial court sustained an objection to this testimony and instructed the jury to disregard it. Given the presumption that the jury will follow the court's instructions,[150] Dr. Reus's statement was not a denial of Haq's right to a fair trial.

### Objections Not Preserved at Trial

¶98 Some of the statements to which Haq now objects were not challenged at trial. We thus analyze these

---

[147] *Id.* at 35-36.

[148] *Swan*, 114 Wn.2d at 661-62.

[149] Report of Proceedings (Dec. 1, 2009) at 126.

[150] *Swan*, 114 Wn.2d at 661-62.

claimed errors under RAP 2.5(a)(3) and hold that none are manifest errors that affect a constitutional right.[151]

¶99　For purposes of RAP 2.5(a)(3), "manifest error" requires a showing of actual prejudice.[152] To demonstrate actual prejudice, there must be a plausible showing by the appellant that the asserted error had practical and identifiable consequences in the trial of the case.[153] To ensure that the actual prejudice inquiry and the harmless error analysis are distinct, "the focus of the actual prejudice must be on whether the error is so obvious on the record that the error warrants appellate review."[154] For witness opinion testimony, " '[a]dmission of witness opinion testimony on an ultimate fact, without objection, is not *automatically* reviewable as a "manifest" constitutional error.' But, 'an explicit or almost explicit' opinion on the defendant's guilt or a victim's credibility can constitute manifest error."[155]

¶100 Haq now challenges statements made at trial by Officers William Collins and Timothy Pasternak that he was an "active shooter" and was hunting for people to execute.[156] In his testimony, Officer Collins defined an "active shooter" as a person who was "hunting for people and shooting people as he found them."[157] Additionally, Officer Collins referred to the woman Haq killed, Pamela Waechter, as the person who "had been executed . . . ."[158] This testimony, to which Haq did not object below, was not

---

[151] *State v Lynn*, 67 Wn. App. 339, 344-45, 835 P.2d 251 (1992).

[152] *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009) (quoting *Kirkman*, 159 Wn.2d at 935).

[153] *Id.*

[154] *Id.* at 99-100.

[155] *State v. King*, 167 Wn.2d 324, 332, 219 P.3d 642 (2009) (quoting *Kirkman*, 159 Wn.2d at 936).

[156] Report of Proceedings (Oct. 26, 2009) at 53.

[157] *Id.*

[158] *Id.* at 77.

an explicit or nearly explicit opinion on Haq's guilt. Further, it was not so prejudicial, in the context of the entire trial, so as to create practical and identifiable consequences. Thus, Haq has not met his burden to show that these statements constitute manifest error in violation of his right to a jury trial.

¶101 Haq also claims that Dr. Reus's testimony regarding whether his actions prior to the event at the Jewish Federation "went to the heart" of intent requires reversal. This argument is not persuasive.

¶102 In response to a question about how Haq's purchase of guns contributed to his conclusions, Dr. Reus stated:

> Well, I think they go to the heart of premeditation and intent. And, you know, I think that there are aspects of the purchases that, you know, I think are unusual. . . . The choices he makes about ammunition I think are somewhat unusual in terms of his espoused intent.[159]

While lay witnesses may not generally express an opinion on an ultimate fact of a case,

> it has long been recognized that a qualified expert is competent to express an opinion on a proper subject, even though he thereby expresses an opinion on the ultimate fact to be found by the trier of fact. The mere fact that the opinion of an expert covers an issue which the jury has to pass upon does not call for automatic exclusion.[160]

¶103 Thus, in *State v. Kirkman*,[161] one defendant argued that an expert's testimony that a child's claim of sexual abuse appeared truthful was impermissible.[162] But, the court held that the expert did not invade the province of the

---

[159] Report of Proceedings (Dec. 2, 2009) at 18.

[160] *Kirkman*, 159 Wn.2d at 929 (citing *Gerberg v. Crosby*, 52 Wn.2d 792, 795-96, 329 P.2d 184 (1958); *State v. Ring*, 54 Wn.2d 250, 255, 339 P.2d 461 (1959)).

[161] 159 Wn.2d 918, 155 P.3d 125 (2007).

[162] *Id.* at 929-30.

jury, as the expert's statement was not a clear comment on the child's credibility.[163] Similarly, in *State v. Hayward*,[164] expert testimony whether the victim suffered a temporary but substantial loss or impairment of a bodily function was not an infringement of the jury trial right, though the jury instructions included the same language.[165] The court held that because the expert did not directly discuss Hayward's guilt, his testimony regarding an ultimate issue was not unconstitutional.[166]

¶104 Here, as in *Hayward* and *Kirkman*, Dr. Reus's challenged statements, while concerning an ultimate issue, were not constitutional violations. "[T]testimony is not objectionable simply because it embraces an ultimate issue the trier of fact must decide. 'The fact that an opinion encompassing ultimate factual issues *supports* the conclusion that the defendant is guilty does not make the testimony an improper opinion of guilt.' "[167] Thus, Dr. Reus's testimony was not an infringement of Haq's constitutional right. The claimed error is not manifest.

¶105 Finally, Haq argues that except for some medical testimony, "Dr. Reus primarily went through the state's evidence and gave his opinion that everything from going on the Internet to memorizing the address of the Federation showed intent and premeditation . . . ."[168] He also contends that Dr. Reus's statement complimenting Dr. Wheeler's summary of his interview with Haq was improper. Dr. Reus stated, in reference to Dr. Wheeler's case report, that he was "struck really by its beauty in how outstanding a report I

---

[163] *Id.* at 930.

[164] 152 Wn. App. 632, 217 P.3d 354 (2009).

[165] *Id.* at 650.

[166] *Id.* at 650-51.

[167] *Hayward*, 152 Wn. App. at 649 (citations omitted) (citing *Demery*, 144 Wn.2d at 759 and quoting *City of Seattle v. Heatley*, 70 Wn. App. 573, 579, 854 P.2d 658 (1993)).

[168] Opening Br. of Appellant at 102-03.

thought it was. . . . I thought it remarkable in its detail and logic."[169] But, Haq failed to object to all of this testimony. Such testimony does not rise to the level of a manifest error of constitutional magnitude, and it is not reviewable.

## Expert Testimony Admitted

¶106 Haq argues that both Dr. Wheeler's and Dr. Reus's testimony regarding the definitions of intent, premeditation, and insanity invaded the province of the judge by providing legal instructions. We reject this argument.

¶107 If the legal question in a case is in dispute, expert testimony that expresses an opinion as to the definition of this question is improper.[170] Here, Dr. Reus showed PowerPoint slides during his testimony that defined "insanity," "mental state," "premeditation," and "intent."[171] Dr. Wheeler also referenced the legal definitions provided by the State.[172] But, the legal definitions of intent, premeditation, and insanity were not in dispute, nor did Dr. Reus's PowerPoint presentation state an incorrect or inaccurate statement of these legal principles. Indeed, the definitions of premeditation, intent, and insanity used by Dr. Reus mirrored the definitions provided to the jury by the judge at the beginning of trial and then again before their deliberations. The trial court did not abuse its discretion by admitting this testimony.

¶108 Dr. Reus also testified that the question of insanity was a legal one and that "from a legal standpoint, the question is[,] at this particular point in time of this event" was Haq able to perceive the nature and quality of his

---

[169] Report of Proceedings (Dec. 1, 2009) at 109-10.

[170] *See Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 344, 858 P.2d 1054 (1993); *Terrell C. v. Dep't of Soc. & Health Servs.*, 120 Wn. App. 20, 30-31, 84 P.3d 899 (2004).

[171] Report of Proceedings (Dec. 1, 2009) at 129-33; Ex. 286.

[172] Report of Proceedings (Dec. 3, 2009) at 131-33.

actions or tell right from wrong.[173] He also stated that premeditation had to be "sufficiently long that you, as a jury, are convinced that there was thought—that the act was thought over ahead of time."[174] Haq argues that these statements were unconstitutional invasions of the province of the judge.

¶109 Assuming, without deciding, that these statements were inaccurate and erroneous statements of the law, Haq failed to object to them.[175] Thus, he must demonstrate they constituted a manifest constitutional error under RAP 2.5(a)(3).

¶110 Here, the alleged error is not manifest. Dr. Reus's statements occurred during a many-week trial, with many other expert witnesses. Though Haq attempts to show prejudice by noting the hung jury in the first trial, in which Dr. Reus did not testify, this is insufficient to show manifest error in the trial in which the jury convicted Haq. This is because the differences in outcome could have resulted from other differences between the two trials. In sum, Haq fails to show that Dr. Reus's statements constitute manifest error.

### Excluded Expert Testimony

 ¶111 Haq argues that the refusal of the lower court to allow his experts to testify about anecdotal evidence regarding the connection between "manic flips" and an antidepressant he was prescribed was a constitutional violation. But, the trial court did not abuse its discretion by excluding this evidence.

---

[173] Report of Proceedings (Dec. 1, 2009) at 130-31.

[174] *Id.* at 132-33.

[175] *Id.* at 131-33.

¶112 Under the Fifth, Sixth, and Fourteenth Amendments, a defendant has the right to appear, testify, and defend himself at trial.[176]

> The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process.[177]

¶113 Haq sought to introduce Dr. Robert Julien's stories, told to him by medical professionals, regarding the odd or aggressive behavior triggered by Haq's antidepressant, Effexor. The trial court did not abuse its discretion in excluding this evidence. Here, Haq was able to present his own witnesses and other evidence vital to his defense. Indeed, Haq's witnesses *did* present evidence as to the potential side effects caused by his medication. Dr. Julien was asked whether he thought Effexor was a wise choice for Haq, and he responded that based on a 2006 study that indicated Effexor was associated with the greatest risk of mania, it was not.[178] Later Dr. Julien described a study that attempted to answer "the question of would antidepressants make your mental health worse if given to bipolar patients to treat bipolar depression. And of all those looked at, Effexor was by far the one most likely to cause a manic flip . . . ."[179] Therefore, the trial court did not abuse its discretion by excluding the anecdotal testimony of Dr. Julien.

¶114 Haq relies largely on *Washington v. Texas*,[180] but that case is distinguishable. There, the defendant claimed

---

[176] *See Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).

[177] *Chambers*, 410 U.S. at 294.

[178] Report of Proceedings (Nov. 16, 2009) at 150.

[179] *Id.* at 152.

[180] 388 U.S. 14, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967).

that a Texas statute, which did not allow testimony by an accomplice, violated his Sixth Amendment right to compulsory process and to obtain witnesses in his favor.[181] The court concluded that

> [t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense . . . . Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.[182]

The lack of testimony about anecdotal evidence on a subject that was discussed at trial is distinguishable from *Washington*. The court's ruling was not an abuse of discretion.

## COURT-ORDERED EXAMINATION BY A STATE EXPERT

¶115 Haq argues that the court abused its discretion when it granted the State's motion for a compelled mental health examination, performed by a State expert. Further, he claims that admission at trial of statements made during this examination was improper. We disagree.

¶116 Generally, admission of evidence is reviewed on appeal for an abuse of discretion by the lower court.[183] But, where, as here, an issue is based on the meaning of a statute, it is a question of law and reviewed de novo.[184]

¶117 RCW 10.77.060(1)(a) provides that

> [w]henever a defendant has pleaded not guilty by reason of insanity . . . the court on its own motion or on the motion of any party shall either appoint or request the secretary to designate

---

[181] *Id.* at 15-16.

[182] *Id.* at 19.

[183] *State v. Vars*, 157 Wn. App. 482, 494, 237 P.3d 378 (2010) (citing *State v. Halstien*, 122 Wn.2d 109, 126, 857 P.2d 270 (1993)).

[184] *In re Det. of Aston*, 161 Wn. App. 824, 842, 251 P.3d 917 (2011) (citing *Okeson v. City of Seattle*, 150 Wn.2d 540, 548-49, 78 P.3d 1279 (2003)).

at least two qualified experts or professional persons, one of whom shall be approved by the prosecuting attorney, to examine and report upon the mental condition of the defendant.

Further, CrR 4.7(g) requires the disclosure of any reports of mental examinations and CrR 4.7(b)(2)(viii) allows a court to order the defendant to submit to a reasonable mental health examination.

¶118 The supreme court has analyzed the question of court-ordered mental health examinations in *Hutchinson* I[185] and *Hutchinson* II.[186] In *Hutchinson* I, the defendant argued that "the trial court improperly ordered him to submit to an examination by a psychiatrist *selected by the prosecution*."[187] The court rejected this argument and held that "[w]hen a defendant raises an insanity defense and introduces supporting psychiatric testimony, a court may order the defendant to submit to an examination by a *state psychiatrist* . . . ."[188]

¶119 Here, Haq pleaded not guilty by reason of insanity, and thus put his mental health squarely at issue. *Hutchinson* I indicates that a defendant who pleads in this way may be ordered to submit to an examination, not only by a mental health expert appointed by the court but also by a *state* expert.[189] Thus, the court did not abuse its discretion when it required, over Haq's objection, that he submit to such an examination.

¶120 Haq attempts to distinguish the two *Hutchinson* cases because they involved a defendant alleging diminished capacity and court selected experts. However, *Hutchinson* I made clear that this distinction was unimportant. "The defendant argues that requiring him to sub-

---

[185] *State v. Hutchinson*, 111 Wn.2d 872, 766 P.2d 447 (1989).

[186] *State v. Hutchinson*, 135 Wn.2d 863, 959 P.2d 1061 (1998).

[187] *Hutchinson* I, 111 Wn.2d at 880 (emphasis added).

[188] *Id.* (emphasis added).

[189] *Id.*

mit to a psychiatric examination would deprive him of his right against self-incrimination as he is relying on the defense of diminished capacity[, but] [t]he defenses of insanity and diminished capacity both bring the defendant's mental capacity into question."[190] Additionally, in both *Hutchinson* cases, the expert was "of the State's choosing."[191]

¶121 Additionally, given the holding of *Hutchinson* II, we hold that the admission at trial of the State's expert's testimony was not a violation of Haq's Fifth Amendment rights.

¶122 In *Hutchinson* II, the supreme court held that admission of a state mental health expert's statements requires the court to perform a balancing test.[192] It should balance the preservation of both the defendant's Fifth Amendment rights and the ability of the State to gather information to contravene a defendant's claim of insanity.[193] This test requires the court to weigh the incriminating nature of the statement against its probative value. As the supreme court noted:

> The trial court must . . . determine the scope of the expert's testimony at trial, allowing opinions and observations which were not gleaned from incriminating statements [made by the defendant]. A statement should not be ruled incriminating merely because it tends to show the defendant was capable of forming the crime's requisite mental state. On the other hand, an expert should not be allowed to testify to a defendant's incriminating statements, e.g., confessions or admissions that he or she committed the crime charged. As the Court of Appeals pointed out . . . the trial court can meaningfully address these issues only after a defendant has fully participated in the examination.

---

[190] *Hutchinson* I, 111 Wn.2d at 880.

[191] *Hutchinson* II, 135 Wn.2d at 870.

[192] *Id.* at 878-79.

[193] *Id.*

This distinction will not always be easy to apply, but it balances the defendant's right to be free from self-incrimination with the State's interest in disclosure—"the only effective means it has of controverting [a defendant's] proof on an issue that he interjected into the case."[194]

¶123 The *Hutchinson* II court also explained how *State v. Craney*[195] informed its opinion in *Hutchinson* I. In *Craney*, the defendant was convicted of first degree murder.[196] On appeal, he argued that the admission of expert testimony, which included statements he had made, was improper.[197] The court held it was not.[198] The *Hutchinson* II court used *Craney* to explain its holding:

> Under the *Craney* rule, an observation or statement is not "incriminatory" merely because it tends to show the defendant is sane. In the context of diminished capacity, then, an observation or statement would not be incriminatory merely because it tended to show the defendant's capacity to premeditate or act intentionally was unimpaired. It is important to note *Craney* does not entitle a defendant to refuse to answer incriminating questions; it limits the State's subsequent use of a defendant's answers and expert opinions based on them.[199]

¶124 Here, the court complied with the express requirements laid out by *Hutchinson* II. During the first trial, the lower court applied a balancing test to determine which of Haq's statements to Dr. Wheeler, the State's expert, should be admitted.[200] The court reasoned, after extensive argument by both parties, that Washington law requires

---

[194] *Id.* (quoting *Estelle v. Smith*, 451 U.S. 454, 465, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981)).

[195] 347 N.W.2d 668 (Iowa 1984).

[196] *Id.* at 671.

[197] *Id.* at 673-74.

[198] *Id.*

[199] *Hutchinson* II, 135 Wn.2d at 877.

[200] Report of Proceedings (Apr. 29, 2008) at 3.

the State [to] have access to the defendant, because the defendant is the best evidence. And any opinion coming from that in which the expert would opine on the defendant's sanity or insanity, mental state or ability to form a mental state is not incriminating, even though it could be used to prove the defendant's guilt.

On the other hand, any factual confessional admissions about the actual actus reus, the underlying facts . . . those are incriminating. . . .

In this particular case, by way of an example, Mr. Haq's statements to Dr. Wheeler about procuring the guns, how he procured them, when he procured them, those are factually incriminating admissions . . . .

Dr. Wheeler's observations and conclusions about the defendant's procurement and how it sheds light on his mental state would not be incriminating.[201]

¶125 Before the second trial, the court denied Haq's motion to prevent the State's experts "from testifying to statements made by the defendant during his forensic interviews with Dr. Wheeler."[202] Thus, given the balancing engaged in by the court before the first trial, and its consequent decision before the second trial, the court engaged in the required balancing test, and its actions did not constitute an abuse of discretion.

¶126 Haq also argues that the admission of audio recordings of his statements to Dr. Wheeler were particularly prejudicial and violative of his Fifth Amendment right. But, Haq did not object to the particular form of this evidence, instead objecting to the admission of any testimony by Dr. Wheeler. Generally, an appellate court will not consider issues raised for the first time on appeal unless they involve a manifest error affecting a constitutional right.[203] Here, Haq does not attempt to demonstrate that the particular

---

[201] *Id.* at 95-96.

[202] Clerk's Papers at 8566.

[203] *Kirkman,* 159 Wn.2d at 926.

form in which the evidence was introduced created a manifest error affecting a constitutional right. Thus, we do not consider this new argument on appeal any further.

## JURY INSTRUCTIONS

¶127 Haq argues that the court erred in submitting instructions to the jury that did not require it to find he intended to commit burglary in order to convict him of aggravated murder. We disagree.

¶128 A review of the sufficiency of the evidence requires this court to view the evidence in the light most favorable to the State and determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[204] But, where, as here, a challenge also imputes the meaning of a statute, this court is presented with a question of law and consequently engages in de novo review.[205]

¶129 A person is guilty of aggravated first degree murder under RCW 10.95.020 "if he or she commits first degree murder . . . and one or more of the following aggravating circumstances exist: . . . (11) The murder was committed in the course of, in furtherance of, or in immediate flight from one of the following crimes: (c) Burglary in the first or second degree . . . ." Under RCW 9A.52.020(1), first degree burglary occurs where "with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, the actor . . . (a) is armed with a deadly weapon . . . . "

¶130 Division Two dealt with the question of aggravated murder instructions in *State v. Howland*.[206] There, the

---

[204] *State v. Brown*, 132 Wn.2d 529, 607, 940 P.2d 546 (1997).

[205] *State v. Hacheney*, 160 Wn.2d 503, 512, 158 P.3d 1152 (2007); *see also Cerrillo v. Esparza*, 158 Wn.2d 194, 199, 142 P.3d 155 (2006).

[206] 66 Wn. App. 586, 832 P.2d 1339 (1992), *review denied*, 121 Wn.2d 1006 (1993).

victim was stabbed to death in his apartment.[207] Howland confessed to a police informant that he had killed the victim and was convicted of first degree felony murder with the aggravating circumstance of second degree burglary.[208] Division Two held that no independent felonious purpose was required for a conviction of aggravated murder:

> a general look at the aggravating circumstances enumerated in RCW 10.95.020 indicates that the Legislature did not contemplate that the aggravating circumstances involve an additional or independent criminal intent. . . . *See, e.g.*, RCW 10.95.020(1) (victim was a law enforcement officer); RCW 10.95.020(2) (perpetrator is an escaped prisoner) . . . . None of the above circumstances requires an intent that is independent of the premeditated intent to cause death. Because these circumstances do not involve independent criminal intent, there is no indication that the Legislature contemplated requiring the "burglary" circumstance to involve a separate or independent criminal intent.[209]

¶131 *State v. Hacheney*[210] is the most recent Washington case to interpret RCW 10.95.020. There, the supreme court held that murder committed "in the course of" another felony required "a causal connection such that the death was a probable consequence of that felony."[211] In *Hacheney*, the defendant was accused of suffocating his wife and then setting fire to the house.[212] The jury found him guilty of first degree murder and returned a special verdict for aggravated murder, finding that Hacheney had committed the murder "in the course of" first degree arson.[213] The supreme court rejected this rationale, holding that "[a]

---

[207] *Id.* at 588-89.

[208] *Id.* at 589-90.

[209] *Id.* at 593.

[210] 160 Wn.2d 503, 158 P.3d 1152 (2007).

[211] *Id.* at 506 (citing *State v. Golladay*, 78 Wn.2d 121, 131, 470 P.2d 191 (1970)).

[212] *Id.* at 505.

[213] *Id.* at 506.

person is guilty of aggravated first degree murder if the *murder* was committed 'in the course of' an enumerated *felony, not* if the enumerated felony is committed in the course of the murder. . . . [F]or a killing to have occurred 'in the course of' [an enumerated crime], logic dictates that the [crime] must have begun before the killing."[214] *Hacheney* did not abrogate or otherwise overturn the reasoning in *Howland*.

¶132 Here, Haq's actions mirror those of the defendant in *Howland*, and not those of *Hacheney*. Haq forcibly entered the Jewish Federation, and then murdered Pamela Waechter. The enumerated crime of burglary began before the killing. Haq may not have had an independent felonious intent with regard to burglary, but *Howland* makes it clear that none is needed.

¶133 Haq argues that *Hacheney*'s reference to a California case, *People v. Green*,[215] indicates that the supreme court meant to adopt the entire reasoning of that case. In *Green*, the defendant murdered his wife, and then took her purse and the clothing she had worn. The California court held that the elevation to "special circumstances" was not warranted as the robbery had been committed only to conceal the murder itself. But the *Howland* court distinguished both the facts of *Green* and the language of the California aggravated murder statute from Washington's statute. The *Howland* court concluded:

> First, *Green* is factually different. In that case, the defendant killed his wife and then, "to facilitate or conceal the primary crime", he took his wife's jewelry and her money and therefore committed a robbery which was "merely incidental to the murder".
>
> Here, however, the burglary . . . was not conduct merely ancillary or incidental to the murder. It was a necessary precursor to the murder. . . .

---

[214] *Id.* at 518 (some emphasis added) (citaton omitted).

[215] 27 Cal. 3d 1, 609 P.2d 468, 164 Cal. Rptr. 1 (1980), *overruled on other grounds by People v. Martinez*, 20 Cal. 4th 225, 973 P.2d 512, 83 Cal. Rptr. 2d 533 (1999).

Secondly, California law differs markedly from the law in Washington. For example, in California the "merger" doctrine is applied to prohibit a jury instruction on felony murder when the underlying felony is an integral part of the homicide. To the contrary, our State has specifically declined to apply the merger doctrine to a charge of felony murder.[216]

Based on *Howland*, Haq's arguments are not persuasive.

## SUFFICIENCY OF THE EVIDENCE—MALICIOUS HARASSMENT

¶134 Haq argues that the State failed to produce evidence sufficient for the jury to convict him of malicious harassment. We reject this contention.

¶135 Evidence is sufficient to support a conviction if, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime.[217] But, the crime of malicious harassment implicates First Amendment rights.[218] Thus, the appellate court must conduct a review of those facts that are "intermingled with . . . legal questions . . . in order to pass on the constitutional question"[219] and assure the conviction does not violate a defendant's First Amendment rights.[220]

¶136 To convict a defendant of malicious harassment under RCW 9A.36.080, the State must prove beyond a reasonable doubt that:

(1) A person . . . maliciously and intentionally commits one of the following acts because of his or her perception of the victim's race, color, religion, ancestry, national origin, gender,

---

[216] 66 Wn. App. at 592-93 (citation omitted) (quoting *Green*, 27 Cal. 3d at 61).

[217] *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

[218] *State v. Kilburn*, 151 Wn.2d 36, 51-52, 84 P.3d 1215 (2004).

[219] *Id.*

[220] *Id.* at 50.

sexual orientation, or mental, physical, or sensory handicap: [and]

 (a) Causes physical injury to the victim or another person . . . .

The supreme court has stated that "the statute is aimed at criminal conduct and enhances punishment for that conduct where the defendant chooses his or her victim because of their perceived membership in a protected category. *The statute punishes the selection of the victim, not the reason for the selection.*"[221]

 ¶137 Here, Haq intentionally targeted individuals of the Jewish faith, and his malicious intent was demonstrated by both his conduct and the words associated with it. He specifically referenced his frustration and anger with the Jewish people when he was at the Jewish Federation and in telephone conversations afterwards. After being taken into custody on the day of his attack on the Jewish Federation offices, Haq told Detective Al Cruise that "[t]his is about the Jews. . . . This is about the Jews are running the country."[222] When he was being held in King County jail, he told his mother that he had "got the Jews, you know . . . [t]hey were—they were the enemy."[223] A jury was entitled to decide on the basis of these and other statements by Haq that he targeted individuals because of their Jewish faith.

 ¶138 Haq argues that the State failed to produce sufficient evidence that his actions were "caused by religious bigotry." He argues, instead, that all indications were that he was motivated by political beliefs. But, in *State v. Pollard*,[224] this court rejected an argument that the defendant's hostile motivation had to be a substantial factor to

---

[221] *State v. Talley*, 122 Wn.2d 192, 201, 858 P.2d 217 (1993) (emphasis added).

[222] Report of Proceedings (Nov. 2, 2009) at 18.

[223] Pretrial Ex. 12, at 10-12.

[224] 80 Wn. App. 60, 906 P.2d 976 (1995).

support a finding of malicious harassment.[225] There, the defendant argued that his racial bias played "only a small role" in his assault on the victim, and thus did not satisfy the requirements of the malicious harassment statute.[226] This court disagreed, explaining that it did not think it was necessary to read a substantial factor requirement into RCW 9A.36.080.[227] Here, though Haq argues that he was motivated only by political ideology, his statements belie this argument and indicate that he was motivated by *both* religious bigotry and political ideology. Thus, even if Haq was motivated *in part* by a dislike of Israeli politics, there was sufficient evidence before the jury to demonstrate that his motivations were *also* based on religious bigotry.

## CUMULATIVE ERROR

¶139 Haq argues that cumulative error denied him a fair trial. We hold that there were no errors below and thus there was no cumulative error.

¶140 Where several errors standing alone do not warrant reversal, the cumulative error doctrine requires reversal when the combined effects of the errors denied the defendant a fair trial.[228]

¶141 Here, there is no showing that Haq was denied a fair trial by cumulative error because there were no errors.

¶142 We affirm the judgment and sentence.

GROSSE and ELLINGTON, JJ., concur.

Review denied at 174 Wn.2d 1004 (2012).

---

[225] *Id.* at 68-69.

[226] *Id.* at 67-68.

[227] *Id.* at 69.

[228] *State v. Coe*, 101 Wn.2d 772, 789, 684 P.2d 668 (1984).