FILED
COURT OF APPEALS
DIVISION II

2015 JUL 21 AM 9:27

STATE OF WASHINGTON
BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 45933-7-II |
| Respondent, | |
| v. | |
| JOHNNIE MURREL COOLEY, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, C.J. — Johnnie Murrel Cooley appeals his jury trial convictions for four counts of domestic violence court order violation,[1] the special verdict domestic violence findings, and the imposition of legal financial obligations (LFOs). He argues that (1) the trial court erred in admitting a portion of a 911 recording in which the operator identifies the number the call originated from, (2) his trial counsel provided ineffective assistance of counsel when he failed to request a limiting instruction related to this portion of the 911 recording, and (3) the trial court erred when it failed to consider his ability to pay before imposing discretionary LFOs. In a pro se statement of additional grounds for review[2] (SAG), he raises several additional ineffective assistance of counsel claims and challenges jury instruction 17, which advised the jury how to complete the special verdict forms. We hold that the admission of the 911 operator's statement

---

[1] RCW 26.50.110(5); RCW 10.99.020.

[2] RAP 10.10.

No. 45933-7-II

was harmless, that Cooley does not establish ineffective assistance of counsel on any of his alleged grounds, that any potential error in jury instruction 17 was harmless, and that Cooley has waived his LFO argument. We affirm the convictions and sentence.

FACTS

I. BACKGROUND

Amy Lutter, who had been in a 12-year relationship with Cooley and had two children with him, obtained two protection or no contact orders prohibiting Cooley from having any contact with her, including telephonically or electronically; these orders were in effect in January 2013. In January 2013, Lutter and her daughters were living with Lutter's parents; Cooley lived about a half mile away. On January 13, Lutter received several threatening text messages and calls from Cooley on her cell phone.

On January 17, apparently after Cooley had called her parents' house "all night long" and sent threatening text messages, Lutter decided to walk to Cooley's home to ask his roommate, who was also his employer, to stop Cooley from contacting her. Report of Proceedings (RP) (Dec. 17, 2013) at 78. According to Lutter, as she was walking, Cooley drove around the corner in his truck, saw her, and drove straight at her. She jumped out of the way and fell to the ground. Cooley drove onto the curb and then pulled away. As he pulled away, Lutter threw a rock at the truck, damaging the rear window.

On January 17, at 8:07 AM, 911 received a call from a man reporting that his "[e]x-wife" had thrown a rock at his vehicle window; the caller identified himself as Johnnie Cooley. The caller stated that he would wait for the police at the intersection of South L and South 70th Streets. The 911 system listed the specific number the call came from. When the 911 operator asked the

2

caller what his number was, the caller was unsure. The operator then read the number from the 911 system to the caller, and the caller responded, "Yeah, I think that might be it." Ex. 1 at 1 min. 15 sec. through 1 min. 17 sec.

Tacoma Police Officers Patrick Thomas O'Neill and Chris Yglesias responded to the location given by the 911 caller. Although they were attempting to locate Cooley, they found Lutter at the location; she appeared upset and agitated. Lutter told the officers that her "boyfriend" had tried to run her down. RP (Dec. 17, 2013) at 185. The officers observed tire marks on the grassy area between the road and the sidewalk. It appeared as if the car had driven over the sidewalk and "straddled" it. RP (Dec. 17, 2013) at 192.

Lutter returned to the police station with Officer Yglesias. While at the police station, Lutter received several calls on her cell phone from the same number that had appeared on the 911 system. Officer Yglesias had Lutter answer one of the calls and put it on speakerphone so he could hear the call. According to Officer Yglesias, the male voice said, "You're as good as dead, bitch," and "I'm going to break all the windows at your parents' house" before hanging up. RP (Dec. 17, 2013) at 131. Lutter told Officer Yglesias that the number the call came from was Cooley's number, and she identified the caller's voice as Cooley's. Lutter also showed Officer Yglesias the text messages Cooley had sent her on January 13 and January 14. Based on the information on Lutter's phone, these text messages also originated from the same number that had called 911.

3

The officers later contacted Lutter and collected her cell phone. Lutter signed a consent form allowing them to search the phone. An officer then photographed several threatening text messages from Cooley's number that were sent on January 13.[3]

About two hours after interviewing Lutter, Officer Yglesias located Cooley walking down the street near Lutter's parents' home. When Cooley saw the police car, he turned and started to walk away.

Officer Yglesias stopped Cooley, read him his *Miranda*[4] rights, and asked him why he was in the area. Cooley responded that he was going to Lutter's parents' house to get money for his broken window. He also stated that the tire tracks Officer Yglesias has seen were from him (Cooley) swerving to avoid the rock Lutter had thrown at his truck. Cooley denied having called or texted Lutter. Cooley also told Officer Yglesias that he (Cooley) did not have a functioning phone with him and that his phone was at his house; but he admitted that he had called 911 that day and stated that he had "used another phone" to make that call. RP (Dec. 17, 2013) at 168.

## II. PROCEDURE

### A. CHARGES AND PRELIMINARY MOTIONS

The State charged Cooley with four domestic violence court order violations.[5] It further alleged that all four counts were domestic violence incidents.

---

[3] These photographs were admitted at trial.

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[5] Counts I and II alleged the violations occurred on January 13. Counts III and IV alleged that the violations occurred on January 17.

Before trial, Cooley moved in limine to exclude a portion of the 911 tape as hearsay. Specifically, he objected to the portion of the recording in which the 911 operator asks the caller what number he is calling from, "the caller hesitates and is unable to recall the number, and the 911 operator gives that information to the caller, which the caller agrees to." RP (Dec. 16, 2013) at 52. Cooley argued that the 911 operator's identification of the number the call originated from was hearsay and that it was "testimonial evidence coming from the 911 operator, because the 911 operator is the one that actually said what phone number was that the caller was calling in from. Then the caller said that number must be it." RP (Dec. 16, 2013) at 52. The trial court stated, "I think it's admissible for the limited purpose of showing what the defendant did, not for the truth of the matter asserted by the 911 caller." RP (Dec. 16, 2013) at 55-56.

### B. TRIAL TESTIMONY AND COOLEY'S STIPULATION

The State's witnesses testified as described above. Cooley did not present any evidence.

In addition, Lutter testified that she knew Cooley's voice in person and on the telephone. She further testified that she had listened to the 911 recording and that it was Cooley's voice on the recording.

Katrina Rahier, a tape research analyst for South Sound 911, also testified about the 911 call for the State. Rahier testified that the complaint history (CAD) logs provide the number for the incoming call, that the CAD log was a business record, and that the CAD log for this call showed what number the 911 call originated from.

Rahier also identified the 911 recording. The trial court admitted the 911 recording and played it for the jury. Cooley did not make any additional objections to the admission of the recording.

Detective John William Bair testified that he had photographed the text messages on Lutter's phone. On cross-examination, defense counsel asked Bair what "spoofing of a phone number" was. RP (Dec. 18, 2013) at 214. Bair testified that there are computer programs available that can make it look like a text was sent from a different number than it actually was sent from or you can pay a service to make your number appear to be somebody else's number. Bair admitted that given the information he was able to retrieve from Lutter's cell phone, he was unable to tell what device actually sent a message other than from the information on Lutter's phone itself. He admitted that someone could have used another phone or computer to spoof a number and send a text message that appeared to come from that number but did not. But he also testified that in the numerous phones he had examined, he had only encountered spoofing once. The trial court admitted several photographs of incoming calls and several threatening text messages from Lutter's phone that appeared to come from the same number related to the 911 call.

Cooley stipulated that before January 13 and 17, "there existed a protection order or no-contact order applicable to the defendant and that the protected party was Amy Lutter . . . , and that the defendant knew of the existence of the order, and that the defendant had twice been convicted for violating the provisions of a court order." Clerk's Papers (CP) at 7.

## C. JURY INSTRUCTIONS AND VERDICT

The jury instructions did not include a limiting instruction related to the 911 call. Instruction 17 stated in part,

> In order to answer a special verdict form "yes," you must unanimously be satisfied beyond a reasonable doubt that "yes" is the correct answer. *If you unanimously agree that the answer is "no" or cannot unanimously agree upon an answer, then you must answer "no."*

CP at 28 (emphasis added). Defense counsel did not object to any jury instructions.

6

The jury found Cooley guilty as charged and answered "yes" to each of the special verdict forms.

## D. SENTENCING

At sentencing,[6] the State requested that the trial court impose the crime victim penalty assessment, $200 in court costs, the deoxyribonucleic (DNA) fee, and $2,500 "[Department of Assigned Counsel] DAC recoupment."[7] RP (Feb. 21, 2014) at 284. Neither Cooley nor his counsel argued that he should not pay any discretionary LFOs.

Although the State did not present any information about present or future ability to pay LFOs, defense counsel stated during the sentencing hearing that Cooley and Lutter had both been teachers until 2007 when they "ended up getting involved with methamphetamine, and as a consequence of that, their lives just fell apart." RP (Feb. 21, 2014) at 286. Additionally, in his allocution, Cooley mentioned that his child support payments had been modified to zero because he was going to be incarcerated and had no means to pay child support. He stated that Lutter and their children were now "homeless" and living with the children's grandparents. Additionally, he stated that he would like to be able to "get out and get back to work" as quickly as possible so he could provide support for his children. RP (Feb. 21, 2014) at 288.

The trial court sentenced Cooley to 60 months of total confinement. The trial court also imposed (1) restitution in an amount yet to be determined, (2) $500 crime victim assessment, (3) $100 DNA database fee, (4) $1,500 in court-appointed attorney fees and defense costs, and (5) a

---

[6] The sentencing hearing was held on February 21, 2014.

[7] The "DAC recoupment" is a discretionary cost. RCW 10.01.160(1), (3). The other costs are mandatory. RCW 7.68.035(1)(a); RCW 36.18.020(2)(h); RCW 43.43.7541.

No. 45933-7-II

$200 criminal filing fee, for a total of $2,300. The judgment and sentence contains the following boilerplate finding:

> ABILITY TO PAY LEGAL FINANCIAL OBLIGATIONS. The court has considered the total amount owing, the defendant's past, present and future ability to pay legal financial obligations, including the defendant's financial resources and the likelihood that the defendant's status will change. The court finds that the defendant has the ability or likely future ability to pay the legal financial obligations imposed herein. RCW 9.94A.753.

CP at 49. Even though the trial court did not discuss LFOs at length during the sentencing hearing, it stated that it was ordering only $1,500 in DAC recoupment because Cooley's "daughters could use that money when [he got] out." RP (Feb. 21, 2014) at 289.

Cooley appeals his convictions and LFOs. In his SAG, he also challenges his convictions and the special verdicts.

## ANALYSIS

### I. ADMISSION OF 911 OPERATOR'S STATEMENT

Cooley first argues that the trial court erred when it allowed the jury to hear the 911 operator's recitation of the number the 911 call originated from because this statement was not relevant to the purpose for which the trial court admitted it or any fact at issue and the caller never admitted that the number was his. He further argues that the admission of this evidence was prejudicial because there was no limiting instruction. We hold that any potential error in admitting this portion of the 911 call was harmless in light of the other evidence presented at trial.

We review for abuse of discretion a trial court's evidentiary rulings. *State v. Magers*, 164 Wn.2d 174, 181, 189 P.3d 126 (2008). Abuse of discretion occurs when a trial court's decision is manifestly unreasonable or based upon untenable grounds or reasons. *Magers*, 164 Wn.2d at 181. An evidentiary error is grounds for reversal only if it is prejudicial. *State v. Neal*, 144 Wn.2d 600,

8

611, 30 P.3d 1255 (2001). An error is prejudicial if, within reasonable probabilities, it materially affected the outcome of the trial. *Neal*, 144 Wn.2d at 611. Notably, "'admission of testimony that is otherwise excludable is not prejudicial error where similar testimony was admitted . . . without objection.'" *State v. Weber*, 159 Wn.2d 252, 276, 149 P.3d 646 (2006) (quoting *Ashley v. Hall*, 138 Wn.2d 151, 159, 978 P.2d 1055 (1999)).

The admission of the part of the 911 call in which the 911 operator reads the telephone number from the 911 system was clearly harmless because the tape research analyst also testified that the CAD log for this call showed that the 911 call came from the same number, and Officer Yglesias testified that Cooley admitted to having called 911 that morning.[8] Because the jury heard testimony from other sources about the 911 call's origin without objection, Cooley does not show within a reasonable probability that the 911 operator's statement affected the outcome of the trial and this argument fails. *See Weber*, 159 Wn.2d at 276.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Cooley further argues that the error in admitting the 911 operator's recitation of the number the call originated from was compounded by his trial counsel's failure to request a limiting instruction. He contends that a limiting instruction would have prevented the jury from using this evidence as proof of Cooley's telephone number.

To demonstrate ineffective assistance of counsel, a defendant must show that his counsel's representation was deficient and that the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

---

[8] Cooley did not object to any of this testimony.

Representation is deficient if it falls below an objective standard of reasonableness based on consideration of all the circumstances. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Prejudice occurs when but for counsel's deficient performance, the result of the proceeding would have been different. *McFarland*, 127 Wn.2d at 335. If a party fails to satisfy either prong, we need not consider both prongs. *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726 (2007). Again, because the jury heard testimony from other sources about the 911 call's number of origin without objection, Cooley does not show within a reasonable probability that the 911 operator's statement affected the outcome of the trial and this argument fails. *See Weber*, 159 Wn.2d at 276.

### III. LFOs

Cooley next argues that the trial court failed make an individualized determination on his ability to pay before imposing discretionary LFOs. The State argues that this issue is not ripe for review until the State attempts to enforce the LFOs, that the issue was not preserved for appeal, and that even if we choose to address this issue, the trial court properly considered Cooley's ability to pay. We hold that he waived this argument by failing to object during sentencing.

Our Supreme Court recently rejected the State's ripeness argument in *State v. Blazina*, 182 Wn.2d 827, 833 n.1, 344 P.3d 680 (2015). Accordingly, the fact that the State may not yet be attempting to collect Cooley's LFOs does not preclude our review of this issue.

But Cooley did not challenge the trial court's imposition of LFOs during sentencing so he may not do so on appeal. *State v. Blazina*, 174 Wn. App. 906, 911, 301 P.3d 492 (2013), *remanded*, 182 Wn.2d 827. Our decision in *Blazina*, issued before Cooley's sentencing, provided notice that the failure to object to LFOs during sentencing waives a related claim of error on appeal. 174 Wn.

App. at 911. As our Supreme Court noted, an appellate court may use its discretion to reach unpreserved claims of error. *Blazina*, 182 Wn.2d at 830. We decline to exercise such discretion here.

## IV. SAG ISSUES

In his SAG, Cooley argues that he received ineffective assistance of counsel when he failed to object to a variety of issues and that jury instruction 17, which instructed the jurors that they could answer "no" to the special verdict if they could not unanimously agree, was improper and prejudicial. These arguments all fail.

### A. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

#### 1. STANDARD OF REVIEW

As we noted above, to demonstrate ineffective assistance of counsel, Cooley must show that defense counsel's representation was deficient and that the deficient performance was prejudicial. *Strickland*, 466 U.S. at 687. Representation is deficient if it falls below an objective standard of reasonableness based on consideration of all the circumstances. *McFarland*, 127 Wn.2d at 334-35. Prejudice occurs when but for counsel's deficient performance, the result of the proceeding would have been different. *McFarland*, 127 Wn.2d at 335. Thus, to succeed on an ineffective assistance claim that rests on defense counsel's failure to object, Cooley must show that it is likely that the trial court would have sustained the objection had it been made. *State v. Fortun-Cebada*, 158 Wn. App. 158, 172, 241 P.3d 800 (2010). Cooley fails to make this showing.

### 2. FAILURE TO OBJECT TO CLOSING ARGUMENT

In his SAG, Cooley appears to argue that he received ineffective assistance of counsel when defense counsel failed to object to significant portions of the State's closing argument.[9] Cooley fails to show that it is likely that the trial court would have sustained any of the objections he now contends defense counsel should have made.

Cooley objects to the following arguments, asserting that they were comments on his right to not testify:

> Now, this case has four counts. It's clear that the defendant violated this order because electronically he sent her text messages, telephonically he called her, and directly in person when he swerved towards her.

RP (Dec. 18, 2013) at 242.

> And when you look at Plaintiff's No. 3, which was admitted, a lot of the same language appears. This is from Tacoma Municipal Court. "It is ordered that defendant is prohibited from causing or attempting to cause physical harm," when he swerved at her, "by major assault including sexual assault," doesn't apply, "molesting, harassing, threatening or stalking, coming near or have any contact whatsoever in person or through others by mail, phone or any means directly or indirectly."

RP (Dec. 18, 2013) at 244.

> So let's talk a little bit about the facts and the credibility of witnesses. Well, at the beginning of this case I was reading the defendant's cell phone to you. And you've probably seen it more times. Some of you might even have it memorized by now. . . . And where does this number appear again and again and again?

---

[9] Cooley also directs us to portions of the argument from a CrR 3.5 hearing addressing the admissibility of his statements to Officer Yglesias during which defense counsel attempts to raise issues about the admissibility of the text messages and the call Lutter put on speakerphone at the police station. It is unclear why Cooley cites to this portion of the record, and we will not address it further. *See* RAP 10.10(b) (appellant's SAG argument must inform the court of the nature of the alleged error).

No. 45933-7-II

RP (Dec. 18, 2013) at 246.

Now, moving then back to Count I and Count II, the text messages sent on January 13th. And you have those in Plaintiff's No. 11. And what you're going to see is, again, the defendant's cell phone number popping up time and time again. And what I'm going to do is I'm just briefly going to place them on the overhead projector.

Starting on page 3, you work your way back and you will be able to kind of track the time because some of them are duplicates, but Bair had to scroll down to capture the entire text message.

For example, so the bottom right of page 3 that first one comes in at 11:19 p.m. and it's from his number saying, "You're going to die. I will wait for days. I don't care. You will die." And that's kind of the general tone of the threatening text messages.

And as you make your way to the other ones, you see that he's talking about "I've got enough fire power to light up your house like an Xmas tree," so they're kind of the constant harassing text messages that are coming in.

Now, defense asks Detective Bair about the spoofing. Something that is possible. But again, folks, it's kind of like your neighbors playing the joke on you throwing snow on your yard. It's, of course, possible, but is it reasonable? Is it likely? It's certainly not reasonable doubt.

RP (Dec. 18, 2013) at 248-49.

[Lutter] has known the defendant for 12 plus years. They have children in common. She knows his voice. She knows his voice on the telephone. She knows his voice in person. And so when she continues to get those calls again, calls at the police station that are witnessed by Officer Yglesias, independent officer with no personal bias, from the defendant's cell phone number, they finally get that one where they put it on speakerphone, she recognizes his voice. And what is said on that phone call that's overheard by Officer Yglesias? "You're as good as dead, bitch. I'm going to break all the windows at your parents' house." Very consistent in terms of the kind of threats that he's been making to her in text messages days earlier and also consistent with what occurred that morning, right. She cracked his Plexiglass in the back of his truck and he's basically going to retaliate and he's going to break her windows.

What's also in that statement, again, reading between the lines? He knows that she's living at her parents' house. This isn't some random spoofing. He knows that that's where she's staying. How do we know that? That's where the officer sees him when he turns away.

Now, in terms of phone calls, again, Ms. Lutter is the only one that's telling you that her phone was ringing repeatedly while at the station. Officer Ygelasias [sic] says, yes, this number keeps coming up. It's the same number that called 911.

13

RP (Dec. 18, 2013) at 250-51.

Officer Yglesias is questioning him about the phone calls and threats made that morning. He was clear. Phone call and threats that morning and the defendant informed him that it was another phone when asked what phone did you use to call 911. He said it was another phone because he didn't have a functioning phone. It was the phone at home. Well, which phone did you use to call 911? He said he used another phone. So he admits to calling 911, so there should be no mistake as to who was on the phone.

Now, you heard from Detective Bair. His role in this case was to retrieve text data. And normally you just plug in the USB and all that information comes up. It's a fairly simple phone. Pretty straightforward in that it's not a smart phone. I think he talked about that. And the best he could do in this case was to take pictures of it and that's why you have the pictures versus like the actual printout of the phone data itself.

And he told him, yeah, spoofing is a possibility, but that doesn't arise to reasonable doubt because there's absolutely no evidence of spoofing whatsoever. And, in fact, the statements that the defendant makes at the scene, the states [sic] that he makes in the text messages, the statements that he makes when the call that's on speakerphone that is identified by [Lutter] as being him, they kind of tie everything together. In looking at the big picture, that's when you as the jury get to determine defendant is guilty of all four counts.

RP (Dec. 18, 2013) at 253-54.

Defense counsel described a one-sided domestic breakup where essentially all the anger is attributed to [Lutter] and then neglects to include that that anger could also be the defendant, the anger why he swerved at her or why he sent her threatening text messages or why he's calling her and threatening her over the telephone.

He also tells you not to speculate and then asks you to speculate to the point where you defy common sense. And an example of that is, he tells you, you know, that there's no evidence that his client is the individual who was identified by [Lutter] that called 911. Yet all of his statements that he makes to Officer Yglesias corroborates that.

What's the likelihood that some unknown person is calling 911 describing that they're Johnnie Cooley that she just threw a rock that, you know, it's right by my house and, you know, she's at this location. I'm going to follow her. Okay. I'm not going to follow her.

And then it just so happens that what, I think maybe 10:45 that morning when Officer Yglesias contact him, defendant's in the area, starts talking about why are you talking to me, you got to talk to her about the broken window; doesn't have an explanation as to the swerving but says why the tracks went towards her but then

14

is talking about how he had to swerve out of the way. It defies common sense. The statements of Officer Yglesias corroborates that he's the person that called 911.

RP (Dec. 18, 2013) at 272-73.

He wants you to essentially disregard all the other evidence that connects the dots for you, all the overwhelming evidence.

And in terms of the defendant's statements, he wants you, again, to ignore the statements that he made about talking to her parents about the broken window. And then he tells you, common sense -- don't check your common sense at the door. And so he talks about when the officer's asking him about calling 911, and he says, well, I used another phone, defense wants you to believe that the defendant was talking about some other 911 call some other date. Officer Yglesias was clear they were talking about what had occurred that morning. That defies common sense, folks, beyond a reasonable doubt, beyond a reasonable doubt. Not any doubt whatsoever, not one hundred percent. Without any doubt whatsoever, beyond a shadow of a doubt, a reasonable doubt.

RP (Dec. 18, 2013) at 276-77.

In closing argument, the State has wide latitude in making arguments to the jury and may draw reasonable inferences from the evidence. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). These portions of the State's closing argument are based on reasonable inferences from the record and did not comment in any way on Cooley's right to remain silent. Thus, Cooley has not shown that any objection would have been successful and cannot establish ineffective assistance of counsel on this ground.

### 3. Authentication of Texts and Speakerphone Call

Cooley next argues that defense counsel failed to argue that the trial court should exclude the "cell phone evidence" because the State had not sufficiently identified or authenticated this evidence.[10] SAG at 8. Again, we disagree.

ER 901(a) provides, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The proponent of the evidence meets this requirement "if sufficient proof is introduced to permit a reasonable trier of fact to find in favor of authentication or identification." *State v. Danielson*, 37 Wn. App. 469, 471, 681 P.2d 260 (1984). Identity of a party making a call may be established by direct or circumstantial evidence. *Danielson*, 37 Wn. App. at 472.

The evidence here showed that all of these communications originated from a specified number, Lutter identified the caller on the speakerphone as Cooley, the CAD log stated that the 911 call had originated from this same number as these calls, and Cooley admitted to Officer Yglesias that he (Cooley) had placed the 911 call. This is sufficient evidence to support a finding that the text messages and cell phone call Officer Yglesias heard over the speakerphone were what the State purported them to be, texts and calls from Cooley. Because there was sufficient evidence to satisfy ER 901(a), Cooley does not show that any objection to the admission of this evidence

---

[10] Cooley also mentions that defense counsel "inartfully" objected to the introduction of the text messages and "voice admissions" in the aforementioned CrR 3.5 hearing. SAG at 9. To the extent Cooley is attempting to argue that the trial court erred in not considering this objection, that argument fails. The trial court properly refused to consider these objections at the CrR 3.5 hearing because they were not relevant to whether Cooley's statements to Officer Yglesias were admissible.

on this ground would have been successful. Accordingly, he does not establish ineffective assistance of counsel.

### 4. AUTHENTICATION OF 911 CALL

Cooley further argues that defense counsel failed to argue that the 911 call was not properly authenticated. But "[a] sound recording . . . need not be authenticated by a witness with personal knowledge of the events recorded. Rather, the trial court may consider any information sufficient to support the prima facie showing that the evidence is authentic." *State v. Williams*, 136 Wn. App. 486, 500, 150 P.3d 111 (2007). The identity of a party to a telephone conversation may be established by either direct or circumstantial evidence. *Danielson*, 37 Wn. App. at 472. Here, the 911 caller stated that his name was Johnnie Cooley, Lutter identified Cooley's voice on the tape, and Cooley admitted to Officer Yglesias that he had called 911. This evidence was sufficient to establish identity and it is not likely the trial court would have granted a motion brought on this ground. Accordingly, Cooley does not show that defense counsel's failure to raise this issue amounted to ineffective assistance of counsel.

### 5. PRIVACY ACT

Cooley next argues that defense counsel should have objected to the testimony about the speakerphone call because it was obtained in violation of the privacy act.[11] Again, we disagree.

Washington's privacy act prohibits the State from intercepting a private telephone communication by use of a device designed to record or transmit the communication without consent. RCW 9.73.030(1)(a). It does not prevent a police officer from listening in person to a

---

[11] Ch. 9.73 RCW.

communication he can hear because the phone is tilted his way or, as here, comes from a speakerphone. *State v. Corliss*, 123 Wn.2d 656, 662, 870 P.2d 317 (1994). That activity falls outside the privacy act because it does not involve a device used to record or transmit the communication. *Corliss*, 123 Wn.2d at 551. Accordingly, any potential motion challenging this evidence on this ground would have failed and Cooley does not establish ineffective assistance of counsel on this ground.

### 6. FOURTH AMENDMENT

Cooley further contends that defense counsel failed to argue that the testimony about the speakerphone call violated his (Cooley's) right to privacy under the Fourth Amendment because it was obtained without a search warrant. We disagree.

Relying on *State v. Haq*, 166 Wn. App. 221, 268 P.3d 997 (2012), Cooley argues that Officer Yglesias's "intercept[ion]" of this conversation was an attempt to solicit a confession. SAG at 13. *Haq* addresses recordings of jail telephone calls as a violation of right to counsel. 166 Wn. App. at 249. But such violations require governmental effort to elicit incriminating statements from the appellant and that did not occur here, so *Haq* is not helpful to Cooley. 166 Wn. App. at 249-51. To the extent Cooley is also arguing that Officer Yglesias's listening in to the call was a violation of his right to privacy under article I, section 7 of the Washington Constitution, that argument was also expressly rejected in *Corliss*. 123 Wn.2d at 664. Thus, Cooley does not show that any motion challenging the speakerphone evidence on this ground would have succeeded, and he fails to establish ineffective assistance of counsel.

## 7. RIGHT TO REMAIN SILENT/RIGHT AGAINST SELF-INCRIMINATION

Cooley next argues that defense counsel failed to argue that the admission of the text messages and the testimony about the speakerphone call violated his (Cooley's) right to remain silent and his right against self-incrimination. Again, we disagree.

The right to remain silent and the right against self-incrimination prohibit the State from compelling the defendant to testify at trial or forcing him to participate in a custodial interrogation. *State v. Mendes*, 180 Wn.2d 188, 195, 322 P.3d 791 (2014), *cert. denied*, 135 S. Ct. 1718 (2015). A defendant's voluntary statements to a victim, such as the ones here, do not fall under those protections. Accordingly, Cooley has not shown that any motion based on this ground would have been successful and he fails to establish ineffective assistance of counsel.[12]

## 8. SIXTH AMENDMENT RIGHT TO COUNSEL

Citing *Randolph v. California*, 380 F.3d 1133, 1144 (9th Cir. 2004), Cooley also appears to assert that defense counsel should have challenged the evidence related to the speakerphone call as a violation of his Sixth Amendment right to counsel because Lutter was acting as an agent for the State by stimulating the conversation about the charged crime. Again, we disagree.

"Once a defendant's Sixth Amendment right to counsel has attached, the government is forbidden from 'deliberately eliciting' incriminating statements from the defendant." *Randolph*, 380 F.3d at 1143 (quoting *Massiah v. United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964)). In *Randolph*, the court considered whether a jailhouse informant was acting as an

---

[12] Cooley also cites to *Townsend v. Sain*, 372 U.S. 293, 307, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5-6, 112 S. Ct. 1715, 118 L. Ed. 2d 318 (1992). *Townsend* addresses admission of confessions not the admission of a defendant's voluntary statements to a victim, so it is not helpful here.

19

agent for the State when he obtained information about the defendant and, therefore, violated the defendant's Sixth Amendment right to counsel. 380 F.2d at 1143-44. Here, however, even assuming that Cooley's right to counsel had attached, Lutter did not initiate the contact at issue; she merely answered her phone and placed it on speakerphone. She did not act as an agent. Accordingly, Cooley does not show that a motion brought on this ground would have been successful, and he fails to establish ineffective assistance of counsel.

### 9. RIGHT TO CONFRONTATION

Cooley further argues that defense counsel failed to argue that the admission of the 911 call violated his (Cooley's) right to confront witnesses under article I, section 22 and the Sixth Amendment because he was not allowed to rebut the evidence authenticating the 911 tape—he appears to refer to Officer Yglesias's testimony that Cooley had admitted calling 911 the day of the incident. This argument also fails.

The state and federal confrontation clauses give a defendant a right to confront and cross-examine witnesses testifying against him. *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *State v. McDaniel*, 155 Wn. App. 829, 846, 230 P.3d 245 (2010). The confrontation clause prohibits admission of testimonial statements made by a witness *who did not appear at trial* unless the witness was unavailable to testify and the defendant had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 53-54. Officer Yglesias testified at trial, so there was no violation of Cooley's confrontation rights. That Cooley chose not to testify was a voluntary waiver of his right to provide testimony challenging Officer Yglesias's testimony. Accordingly, there is no likelihood that the trial court would have granted a motion brought on this basis, and Cooley fails to establish ineffective assistance of counsel.

20

## B. SPECIAL VERDICT FORMS

Finally, Cooley argues that jury instruction 17 was improper because it required the jury to be unanimous and did not allow the jury to leave the form blank if it did not come to a unanimous decision. We hold that Cooley failed to preserve this argument under RAP 2.5(a).

We generally decline to review claims that an appellant raises for the first time on appeal. RAP 2.5(a). We will, however, review an argument for the first time if it concerns a "manifest error affecting a constitutional right." RAP 2.5(a)(3). "A constitutional error is manifest if the appellant can show actual prejudice, i.e., there must be a 'plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case.'" *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011) (internal quotation marks omitted) (alteration in original) (quoting *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009)).

In Washington, defendants have a constitutional right to a unanimous verdict. *State v. Badda*, 63 Wn.2d 176, 181-82, 385 P.2d 859 (1963). A jury's inability to come to a unanimous agreement is not the equivalent of an acquittal for purposes of double jeopardy. *In re Pers. Restraint of Candelario*, 129 Wn. App. 1, 6, 118 P.3d 349 (2005) (quoting *State v. Despenza*, 38 Wn. App. 645, 654, 689 P.2d 87 (1984)). But even presuming, but not deciding, that jury instruction 17 was constitutionally defective because it allowed the jury to *reject* the special verdict even if it was not unanimous, Cooley does not show actual prejudice. The jury unanimously found that he and Lutter *were* members of the same family or household. Thus, the court's instruction

to the jury that it must answer "no" if it could *not* come to a unanimous decision played no role in the jury's decision and there was no risk the jury failed to reach a unanimous decision.

Apparently citing *State v. Bashaw*, 169 Wn.2d 133, 147-48, 234 P.3d 195 (2010), *overruled by State v. Nunez*, 174 Wn.2d 707, 285 P.3d 21 (2012), Cooley argues that this alleged error was not harmless because when unanimity is required, a juror with reservations may not hold to his or her position or may not raise additional questions that could have led to a different result. *Bashaw* is not helpful here. *Bashaw* held that it was error to instruct the jury that the special verdict had to be unanimous, but our Supreme Court reversed this holding in *Nunez*. *Nunez*, 174 Wn.2d at 709-10. And to the extent we can still analogize to *Bashaw*'s harmless error analysis, the same concern expressed in *Bashaw* does not exist here because Cooley's jury was instructed that it was to vote "no" if it could not come to a unanimous decision, an option not available to the jury in *Bashaw*. Thus, unlike in *Bashaw*, there is no question here whether the jury's unanimous decision that Cooley and Lutter were members of the same family or household was a unanimous verdict. Because Cooley does not show a manifest error affecting a constitutional right, he has waived this issue.[13]

In sum, we hold that the admission of the 911 operator's statement was harmless, that Cooley does not establish ineffective assistance of counsel on any of his alleged grounds, that he

---

[13] To the extent Cooley is also raising this as an ineffective assistance of counsel claim, that argument would also fail because Cooley cannot establish prejudice.

No. 45933-7-II

has waived his LFO challenge, and that any potential error in jury instruction 17 was harmless. Accordingly, we affirm the convictions and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, C.J.

I concur:

SUTTON, J.

No. 45933-7-II

BJORGEN, J. (concurring) — For the reasons set out in my dissent in *State v. Lyle*, ___ P.3d ___, No. 46101-3-II, 2015 WL 4156773 (Wash. Ct. App. July 10, 2015), I would reach Johnnie Cooley's legal financial obligations' challenge, even though he did not raise it during sentencing. However, the majority in *Lyle*, a published decision, reached a contrary conclusion. *Lyle*, ___ P.3d ___, No. 46101-3-II, 2015 WL 4156773 (Wash. Ct. App. July 10, 2015). Unless *Lyle* is overturned or its bases questioned by subsequent case law, I shall observe its result under principles of stare decisis. Therefore, I concur in this decision with the reservation here expressed.

BJORGEN, J.

24