IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86678-8-I |
| Respondent, | |
| v. | DIVISION ONE |
| EDWARD MOTLEY, JR., | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, J. — On June 26, 2020, Edward Motley Jr. fought with and robbed Wesley Benson. Video surveillance footage revealed that during the fight, Benson fell to the ground and Motley continued to punch Benson numerous times until Benson's head was bleeding. Benson was treated at Harborview Medical Center. Eleven days after Benson's hospitalization, he suffered a cardiac arrest. Two days later, Benson was declared brain dead, removed from life support, and died. Motley was charged and found guilty of murder in the first degree. Motley appeals. Because sufficient evidence shows that Motley's attack was the proximate cause of Benson's death, we affirm.

FACTS

Background

On June 26, 2020, at about 12:33 p.m., officers responded to 911 calls that Benson was assaulted and "punched into the floor" in the parking lot of a shopping plaza on Rainier Avenue South in Seattle. Police recovered video

surveillance footage that showed that Motley walked over to Benson, and Motley and Benson fought. Benson then fell to the ground, and Motley continued to punch Benson numerous times until Benson's head was bleeding. Motley went through and took the contents of Benson's pockets and Benson's shoes. Motley left the scene before police arrived.

Witnesses on the scene reported that Benson had been lying on the ground for about 15 minutes before police and firefighters arrived on the scene. Benson was able to answer questions, but his speech was slurred and slow. Firefighters and emergency medical technicians observed that Benson's right temple and left cheek were swollen, his mouth was bloody, his eyes were bloodshot, and Benson experienced pain in the swollen areas.

Benson was brought to Harborview Medical Center, where he reported he experienced pain in his jaw and a "squeezing" pain in his head. A urinalysis showed that Benson had cannabinoids and cocaine in his system.[1] Benson also had a prior history of hypertension and a clipped aneurysm. About midway through Benson's hospital stay, he fell out of bed because he was disoriented. Benson sustained an abrasion on his forehead, and a computerized tomography (CT) scan found that Benson was in the same condition as he was before the fall from his bed. Around 10 days into Benson's hospitalization, Benson suddenly became less responsive, and his doctors noted that Benson was in an altered mental state. Eleven days into Benson's treatment, he suffered a cardiac arrest.

---

[1] Dr. Joshua Jauregui, an emergency physician at Harborview who treated Benson, testified that Benson's hematoma, bleeding, in his brain and broken jaw were not associated with his cocaine use.

2

Two days later, Benson was declared brain dead and taken off life support. Motley was charged with murder in the first degree.

Trial

*Evidence at Trial*

In trial, Dr. Jauregui testified that when Benson was admitted, he underwent a CT scan. The scan showed that Benson had two subarachnoid hemorrhages[2] and one subdural hematoma.[3] The CT scan also noted a mass effect[4] squeezing Benson's brain.[5] Based on the CT scan, Dr. Jauregui concluded that Benson experienced a blunt force injury, and no evidence existed of a residual aneurysm. A CT scan of Benson's face showed that he sustained a displaced fracture in his right lower jaw, a non-displaced fracture of the anterior left jawbone, and chronic fractures of the right nasal bone and right lamina papyracea.[6]

After Benson died, Dr. Richard Harruff, a medical examiner, conducted a microscopic analysis of Benson's lungs. Dr. Harruff's analysis did not show evidence of pneumonia, bleeding, or scar tissue. A microscopic analysis of

---

[2] A subarachnoid hemorrhage is bleeding in a deep layer of the brain. A subarachnoid hemorrhage can result from injury or an aneurysm rupture.

[3] A subdural hematoma is "bleeding between the surrounding tissues" and the brain. A subdural hematoma can result from trauma or an injury.

[4] Dr. Jauregui testified that a mass effect is caused by "blood expanding to where it's pressing the brain."

[5] Dr. Jauregui testified that there is "limited space in the skull" and if something else occupies the skull besides the brain, the brain "gets squished down." As the brain squeezes, it can herniate, stop functioning, and ultimately lead to death.

[6] The lamina papyracea is a thin bone that is part of an eye socket and next to the nose.

Benson's brain showed evidence that his brain was not getting enough oxygen. Based on the analysis, Dr. Harruff concluded that Benson's cause of death was blunt force injury of the head. Dr. Harruff explained that "the underlying cause, the bottom line is blunt force injury of [the] head. And [Benson's injury] set off the sequence of events that ultimately led to his death."[7] In addition, Dr. Harruff testified that the contributing factors to Benson's death were heart disease and lung disease. When asked what role Benson's preexisting conditions played in his death, Dr. Harruff explained,

> There may have been no effect, or they may have predisposed him to an adverse outcome, such as dying. There's really no way to look at this and say what proportion was due to his pre-existing disease, what proportion was due to his head injury.
>
> . . .
>
> [T]he preexisting conditions are contributing factors in that they were there and they reduced his chances for a good outcome. He wasn't going to have a good outcome in any case. But in this case, he succumbed to his injuries with or without the pre-existing conditions.

Dr. Harruff concluded that Benson succumbed to his severe head injury despite his preexisting conditions. Dr. David Carlbom, an intensive care physician who treated Benson at Harborview, concluded that, "[h]ad the traumatic subarachnoid not happened, [Benson] would not be hospitalized, he would not have altered mental status, he wouldn't have pneumonia or suspected pneumonia or

---

[7] Dr. Harruff further explained, "as a result of blunt force injury, there's subdural and subarachnoid hemorrhage, cerebral cortical contusion with parenchymal and ventricular extension of hemorrhage" and loss of oxygen going to the brain.

4

aspiration pneumonitis, he wouldn't have had hypoxia.  He wouldn't have had a cardiac arrest had he not had hypoxia."

*Prosecutor's Closing Argument*

In closing arguments, the prosecutor referenced Motley's jail calls.  The prosecutor stated that during a jail call, Motley "doesn't say, I can't believe they charged me, they got the wrong guy."  The State then asserts, "What does he say?  He says, [t]hey overcharged me.  This was just a mutual fucking fight.  Those were his words."  Motley did not object to the statement.  Referring to a separate jail call, the prosecutor contends that "it's clear at this point [Motley's] been talking to his attorneys about what the various defense theories of the case might be. . . . Does he tell his friend, I've been trying to tell my attorneys you've got the wrong guy."  Motley objected, stating that it was a "comment on pre-trial silence."  The court overruled Motley's objection.  The prosecutor continued his closing argument, asserting that Motley does not tell his friend on the call that "they got the wrong guy."  Instead, Motley told his friend, "This ain't nothing but a fucking fistfight.  Nothing was taken.  I didn't rob anybody."

Later in closing, the State addressed its burden of proof stating, "We operate on a system of beyond a reasonable doubt.  And as you heard from Judge Donohue, a reasonable doubt is a doubt for which a reason exists.  So[,] you need to have a reason to believe that Mr. Benson's health was so bad prior to his brain injury . . ."  Motley objected, asserting that the State's argument misstated the burden of proof, and the court overruled.  The State continued, ". . . to have a reason to believe that Mr. Benson's health was so bad prior to his brain

5

injury, that 11 days later, he was going to have a cardiac arrest and he would die from it."

As the prosecutor explained the charges against Motley and the jury verdict forms, he asked the jury that if it finds that Motley is guilty, enter guilty for counts one and two. The prosecutor then stated, "At sentencing, the [S]tate is going to merge [the charges] together. Mr. Motley will be sentenced on one count of murder." Motley did not object to the prosecutor's statement.

ANALYSIS

Sufficient Evidence for Felony Murder

Motley asserts that there was insufficient evidence that he was the proximate cause of Benson's death, given the time that passed between the initial assault and Benson's death, and the fact that Benson had serious preexisting health conditions which could have caused cardiac arrest.

This court reviews sufficiency of the evidence claims under a de novo standard. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

In a sufficiency of the evidence appeal, "we view the evidence in the light most favorable to the State and ask whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *State v. Elmi*, 166 Wn.2d 209, 214, 207 P.3d 439 (2009). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

A person is guilty of felony murder when they "commit[] . . . the crime of either (1) robbery in the first or second degree . . . and in the course of or in

6

furtherance of such crime or in immediate flight therefrom he or she . . . causes the death of a person other than one of the participants." RCW 9A.32.030(1)(c). "[T]he purpose of the felony murder statute is to establish that once a person decides to commit an enumerated felony, [they are] responsible for all of the fatal consequences, intended or not." *State v. Hacheney*, 160 Wn.2d 503, 515, 158 P.3d 1152 (2007). For the death to occur in the course of a crime, "there must be a causal connection such that the death was a probable consequence" and the causal connection must be clearly established. *Hacheney*, 160 Wn.2d at 506; *State v. Brown*, 132 Wn.2d 529, 608, 940 P.2d 546 (1997). "More than a mere coincidence of time and place is necessary." *Brown*, 132 Wn.2d at 608 (quoting 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 7.5, 225). In addition, to establish proximate cause, the State must establish that the acts "were both the legal and the actual cause of the death." *State v. Frahm*, 193 Wn.2d 590, 596, 444 P.3d 595 (2019). Actual causation is proven by establishing a " 'physical connection between an act and an injury.' " *Frahm*, 193 Wn.2d at 596 (quoting *Hartley v. State*, 103 Wn.2d 768, 778, 698 P.2d 77 (1985)). Legal causation looks at whether " 'the connection between the ultimate result and the act of the defendant is too remote or insubstantial to impose liability.' " *Frahm*, 193 Wn.2d at 597 (quoting *Schooley v. Pinch's Deli Market, Inc.*, 14 Wn.2d 468, 478-79, 951 P.2d 749 (1998)).

Motley urges us to evaluate sufficiency of the evidence under a proximate cause standard that determines whether the act "must have at least created a more than 50 [percent] diminution in the chance of survival." This is the incorrect

7

standard. Rather, this court must evaluate whether the jury could have found beyond a reasonable doubt that Motley committed robbery, and that a causal connection exists between the robbery and Benson's death. Motley does not contest the robbery element on appeal. Therefore, we review whether a causal connection exists between Motley's attack during the robbery and Benson's cardiac arrest.

At trial, two doctors testified that after assessing Benson's case, they concluded the blunt force trauma caused by Motley ultimately led to Benson's death. Dr. Harruff and Dr. Carlbom concluded that a causal connection exists between the injuries Benson sustained from Motley's actions and Benson's death.

The defense's witness, Dr. Ronald Auer[8], testified that Benson's hematoma was not the cause of the cardiac arrest because by day 11, the hematoma was unchanged. Rather, Dr. Auer concluded that Benson's death was not caused by his traumatic brain injury because "there's an abundance of high blood pressure, a very diseased heart[,]" and lung disease. Motley claims that but for causation was not established because the evidence did not show that the brain injury was Benson's cause of death, and not emphysema, heart disease, or aspiration pneumonitis. Motley's argument misinterprets proximate causation. The jury instructions stated: "The term 'proximate cause' means a cause which, in a direct sequence, unbroken by any new independent cause,

_____

[8] Dr. Auer is a physician scientist at the Royal University Hospital in Saskatchewan, Canada. Dr. Auer does autopsies and biopsies in his daily work.

8

produces the death, and without which the death would not have happened. There may be more than one proximate cause of death."

Thus, the State did not need to establish that Benson's traumatic brain injury was the only proximate cause of death. Although Motley speculates that Benson's death could have been caused by his preexisting conditions, Motley does not establish that Benson's heart disease or lung disease was an independent cause that Benson would have died from regardless of the traumatic brain injury. In viewing the evidence in the light most favorable to the State, substantial evidence supported that the proximate cause of Benson's death was the traumatic brain injury he sustained due to Motley's actions.

<u>Prosecutor Misconduct in Closing Arguments</u>

Motley contends that the State committed prosecutor misconduct because the State improperly: (1) shifted the burden of proof, (2) commented on Motley's right to remain silent, (3) impugned defense counsel, and (4) disregarded a pretrial ruling. The State maintains that Motley's claims are meritless, and if they had merit, Motley fails to show that the misconduct was prejudicial.

We review claims of prosecutorial misconduct under an abuse of discretion standard. *State v. Brett*, 126 Wn.2d 136, 174-75, 892 P.2d 29 (1995).

To prove that prosecutorial misconduct occurred, "the defendant must establish 'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.' " *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (internal quotation marks omitted) (quoting *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) (plurality

9

opinion)).  In addition, the defendant must show "that 'there is substantial likelihood [that] the instances of misconduct affected the jury's verdict.' " *Thorgerson*, 172 Wn.2d at 443 (alteration in original) (internal quotation marks omitted) (quoting *Magers*, 164 Wn.2d at 191)).  This court considers "any prejudice from error against the backdrop of the trial as a whole."  *State v. Taylor*, 18 Wn. App. 2d 568, 579, 490 P.3d 263 (2021).  If the defendant did not object to the misconduct at trial, it constitutes as a waiver " 'unless the remark is so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.' "  *Thorgerson*, 172 Wn.2d at 443 (quoting *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994)).  Under this standard, the defendant must show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.' "  *State v. Emery*, 174 Wn.2d 741, 761, 278 P.3d 653 (2012) (quoting *Thorgerson*, 172 Wn.2d at 455).

 a. Burden of Proof

During trial, "a prosecutor has wide latitude to argue reasonable inferences from the evidence."  *Thorgerson*, 172 Wn.2d at 453.   But, the prosecutor cannot "argue that the burden of proof rests with the defendant."  *Thorgerson*, 172 Wn.2d at 453.

In the State's closing argument, Motley contends that the court erred in overruling his objection to the State's assertion that the jury would need "[t]o have a reason to believe that Mr. Benson's health was so bad prior to his brain

10

injury, that 11 days later, he was going to have a cardiac arrest and he would die from it." The argument made by the State did not shift the burden of proof. Rather, it was a comment on the amount of evidence supporting that the traumatic brain injury was the cause of the cardiac arrest. After making that statement, the prosecutor referred to the testimony and other evidence that the traumatic brain injury was the underlying cause of Benson's cardiac arrest.[9]

The statement also was an argument that Benson's preexisting health conditions were not an intervening cause of Benson's death. "An intervening cause is a 'force that actively operates to produce harm to another after the actor's act or omission has been committed.' " *Frahm*, 193 Wn.2d at 600 (quoting *Klein v. Pyrodyne Corp.*, 117 Wn.2d 1, 17 n.7, 810 P.2d 917, 817 P.2d 1359 (1991)). If the intervening act is not reasonably foreseeable, it is a superseding act and is sufficient to relieve a defendant of liability. *Frahm*, 193 Wn.2d at 600. In the State's closing, it asserted that for the jury to vote not guilty, it would have to believe that Benson's health conditions were a superseding act. The comment was not an improper articulation about the burden of proof, but a proper reference to jury instruction 18.

Even if the State's comment was burden-shifting, a curative instruction would have negated any prejudicial effect. Looking at the record in its entirety,

---

[9] The State continued, "Dr. Carlbom, the attending neurocritical care physician, Dr. Harruff, the chief medical examiner, Dr. Marshall, the neuropathologist, all of them issued their opinions in July of 2020 based on the medical evidence they reviewed without any sort of stake in the outcome of the trial three years later. They all agreed the traumatic brain injury is an underlying cause, a proximate cause."

the correct burden was stated several times. Prior to the objected statement, the prosecutor stated, "We operate on a system of beyond a reasonable doubt. And as you heard from Judge Donohue, a reasonable doubt is a doubt for which a reason exists." When the court read the jury instructions, it stated, "You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions." Jury instruction 3 also stated the correct burden: "The [S]tate is the plaintiff and has the burden of proving each element of each crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists. A defendant is presumed innocent. This presumption continues throughout the entire trial." Given that the record contains many references to the correct burden of proof, a curative instruction would have offset any possible prejudice. The court did not abuse its discretion when it overruled Motley's burden-shifting objection.

b. Motley's Jail Calls

The prosecutor may not "make closing arguments relating to a defendant's silence to infer guilt." *State v. Easter*, 130 Wn.2d 228, 236, 922 P.2d 1285 (1996). A defendant's Fifth Amendment right to remain silence "can be circumvented by the State 'just as effectively by questioning the arresting officer or commenting in closing argument as by questioning defendant himself.' " *Easter*, 130 Wn.2d at 236 (quoting *State v. Fricks*, 91 Wn.2d 391, 396, 588 P.2d 1328 (1979)).

Motley asserted that the State's comments regarding his failure to tell his friend in a jail call that "they got the wrong guy," improperly suggested that

12

Motley's silence meant he was guilty. But Motley did not remain silent. On the jail call, Motley discussed the felony murder charge, stating, "they overcharged me, man. And this is – man, that is a first degree felony murder. That's a fucking first degree felony murder. . . . Tired of that, man. Mutual fucking fight." Motley's right to remain silent is not at issue because he discussed the events of the charge and his opinion of the charge. In addition, our court has also held that jail calls are admissible evidence. *State v. Haq*, 166 Wn. App. 221, 261-62, 268 P.3d 997 (2012) (holding that jail phone records are admissible if relevant and if its probative value is not outweighed by its potential prejudice). The State argued reasonable inferences from Motley's jail call statements. The court did not abuse its discretion.

    c.  <u>Comment on Motley's Communication with his Attorney</u>

"It is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn the defense lawyer's integrity." *Thorgerson*, 172 Wn.2d at 451. Comments are misconduct "if they 'fundamentally undermine' the attorney's role or integrity." *State v. Fleeks*, 25 Wn. App. 2d 341, 377, 523 P.3d 220 (2023) (quoting *State v. Lindsay*, 180 Wn.2d 423, 433, 326 P.3d 125 (2014)).

Motley claims that the State impugned the defense attorney when it referenced Motley's jail call and stated, "In the third call, it's clear at this point he's been talking to his attorneys about what the various defense theories of the case might be."[10] Motley objected, but his objection was to the State's comments

---

[10] The State then proceeded, "[A]nd he tells his friend – well, let me ask you this: Does he tell his friend, I've been trying to tell my attorneys you've got the wrong guy. I did not fight this man."

on Motley's statement in the jail call.[11]  Because Motley did not object at trial to the State impugning the defense attorney, we must determine whether the State's remark was so flagrant and ill-intentioned that the resulting prejudice was beyond repair.  No evidence indicates that the State's comment was intentional, nor does it rise to the level of improper.  *See State v. Negrete*, 72 Wn. App. 62, 66, 863 P.2d 137 (1993) (holding that the State's comment that "[defense counsel] is being paid to twist the words of the witnesses" was improper); *see Lindsay*, 180 Wn.2d at 433 (holding that it was improper for the State to reference the defense's argument as "a crock," and contended to the jury, "[w]hat you've been pitched for the last four hours is a crock").  In fact, this appears to be the State once again arguing an inference from what Motley's statements in the jail calls did not include.  Because the State did not impugn the defense, no error occurred.

d.  <u>Providing Sentencing Information to the Jury</u>

Our Supreme Court has long held that it is improper for a jury to deliberate the question "of the sentence to be imposed by the court," except in capital cases.  *State v. Bowman*, 57 Wn.2d 266, 271, 356 P.2d 999 (1960).  When a jury does not have a sentencing function, the court should advise it to " 'reach its verdict without regard to what sentence might be imposed.' "  *Shannon v. United States*, 512 U.S. 573, 579, 114 S. Ct. 2419, 2419, 129 L. Ed. 2d 459

---

[11]  Motley's objection was on the State's "comment on the pre-trial silence."

(1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40, 95 S. Ct. 2091, 2095, 45 L. Ed. 2d 1 (1975)).

During pretrial motions, the court granted a "motion to exclude evidence or argument concerning penalty the [d]efendant is subject to if convicted." In closing arguments, while explaining Motley's charges, the State detailed, "At sentencing, the [S]tate is going to merge [the charges] together. Mr. Motley will be sentenced on one count of murder." Motley did not object to this statement. The State directly referred to Motley's potential sentencing if he were found guilty, this was misconduct and in violation of Motley's pretrial motion to exclude evidence or argument concerning the penalty the defendant is subject to if convicted.

Nonetheless, the State's misconduct was not likely to alter the outcome of Motley's trial. When analyzing the entire record, the jury instructions addressed whether the jury could consider Motley's potential sentence, explaining that "[it] may not consider the fact that punishment may follow conviction." Additionally, the court also clarified in jury instructions that "[it] must disregard any remark, statement, or argument that is not supported by the evidence or the law in [the court's] instructions." If objected to, the State's comment on Motley's potential sentence was curable, and the proper instruction was clarified in jury instructions. The misconduct did not have a substantial likelihood of affecting the jury verdict.

e. Cumulative Error

Motley asserts a substantial likelihood exists that the prosecutor's repetitive misconduct resulted in a cumulative prejudicial effect. Thus, Motley claims a new trial is warranted.

Our Supreme Court has "indicated a trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be tried fairly." *Taylor*, 18 Wn. App. 2d at 579 (citing *State v. Rodriguez*, 146 Wn.2d 260, 270, 45 P.3d 541 (2002)). As concluded *supra*, the State committed one instance of prosecutor misconduct in its closing argument and the comment was curable.

We affirm.

_____

WE CONCUR:

_____        _____